# EXHIBIT 1

**"THE Alliance" Operating Agreement** (The "Agreement")

between

**Hapag-Lloyd Aktiengesellschaft (HLC)**

And

**Hyundai Merchant Marine Co., Ltd. (HMM)**

And

**Ocean Network Express Pte. Ltd. (ONE)**

And

**Yang Ming Marine Transport Corp. and Yang Ming (UK) Ltd and Yang Ming (Singapore) Pte. Ltd  (YML)**

(Collectively referred to as the "Lines" or individually as a "Line")

**"THE Alliance" Operating Agreement**

# Contents

Parties to the Agreement
Vision Statement
1. **Definitions**
2. **Period of Agreement**
3. **Scope**
4. **Marketing**
5. **The Services**
6. **Provision of Containerships**
7. **Changes in the Fleet**
8. **Containership Scheduling**
9. **Performance of Containerships**
10. **Non-Performance of Containerships**
11. **Phasing-in/Phasing-out rules**
12. **Transhipment responsibilities for incomplete voyages of Containerships**
13. **Allocation Shares**
14. **Slot Allocation on Containerships**
15. **Use of Slots**
16. **Financial Arrangements**
17. **Liability (General)**
18. **Containership lost or damaged**
19. **Goods lost damaged or delayed**
20. **Goods causing loss or damage**
21. **Scope of Responsible Line's liability: catch-all provisions**
22. **General Average**
23. **Containers**
24. **Breakbulk, Oversized and Dangerous Cargo**
25. **Administration**
26. **Terminal Selection**
27. **Additional Members**
28. **Non-Assignment**
29. **Force Majeure**
30. **Confidentiality**
31. **Compliance with Applicable Laws**
32. **Language**
33. **Notices**
34. **Severability**
35. **Disclaimer of Partnership**
36. **Headings**
37. **Interpretation**
38. **Joint Working Procedure**
39. **Time Zones**
40. **Law and Arbitration**
41. **Fidelity Clause**
42. **Coordination Centre**
43. **Addition of Yang Ming (Singapore) Pte Ltd**

## "THE Alliance" Operating Agreement

**Signatures**

**Appendices**

1.      Reserved for future use
2.      Details of the Services
3.      Demand and Allocation Shares
4.      Containerships available for the Services
5.      Cross Slot-Charterparty
6.      Declaration of Trust
7.      Standby Letter of Credit
8.      Instrument of Variation
9.      THE Alliance Coordination Centre

## "THE Alliance" Operating Agreement

This Agreement is made the 16th day of March, 2020 between:

**Parties to the Agreement**

(1)         Hapag-Lloyd Aktiengesellschaft
            Ballindamm 25
            20095 Hamburg
            Germany                                              **(HLC)**

(2)         Hyundai Merchant Marine Co., Ltd.
            194 Yulgok-ro,
            Jongno-gu, Seoul 03127
            Korea                                                **(HMM)**

(3)         Ocean Network Express Pte. Ltd.
            7 Straits View,
            #16-01 Marina One East Tower,
            Singapore 018936
            Singapore                                            **(ONE)**

(4)         Yang Ming Marine Transport Corp.
            271 Ming De 1st Road, Cidu District,
            Keelung 20646
            Taiwan

            and

            Yang Ming (UK) Ltd.
            2nd Floor, 210 South Street
            Romford, Essex, England, RM1 1TR
            UK

            and

            Yang Ming (Singapore) Pte. Ltd
            171, Chin Swee Road,
            CES Centre #08-01
            Singapore 169877
            Singapore

            (operating as one Line for all purposes here under)     **(YML)**
Hereinafter collectively referred to as the Lines and individually as a Line.

**"THE Alliance" Operating Agreement**

**Vision Statement**

This Agreement is intended to provide the foundation of the co-operation among the Lines, and the following shall be adopted as the "Vision Statement" which underlies THE Alliance. The principles of this co-operation have been constituted in the Heads of Agreement ("HoA") dated and signed June 19th, 2019.

In order to maximize the benefits of the co-operation, the Lines anticipate that the arrangements will include and support:

(a)     The creation of a highly efficient alliance that is responsive, pro-active, focused and competitive.

(b)     The development and operation of Services that meet the needs of the Lines' respective customers, and provide industry leadership in value, quality and choice.

(c)     The costs and operational efficiency of Containerships in the Trades will guide the Service and product development.

(d)     The operation of market oriented and efficient Services with the highest priority on overall quality and schedule reliability in the industry.

(e)     The establishment of an administrative mechanism which is adequate to administer the rules laid down in the HoA, this Agreement and any subsidiary working procedures, with priority on providing a competitive product which is compliant with regulatory requirements.

(f)     The provision of adequate and balanced Containership capacity to meet the Lines' respective and collective assessments of existing and anticipated market demand, provided, however, the Lines recognize that due to newbuilding deliveries in the Interim Period of the HoA and this Agreement, some short term imbalances may be unavoidable.

(g)     The composition of a fleet with an adequate level of carrying capacity according to market growth and/or jointly agreed growth aspirations with individual Lines will provide Containership carrying capacity approximating their individual space requirements. The Lines will review on an annual basis and establish whether overall supply/demand criteria are maintained at a sustainable balance ratio. In this context, it is agreed for HMM to become a significant over-provider of Containership carrying capacity for a minimum of three (3) years and until such time the remaining Lines will introduce capacity. Consequently, HMM acknowledges and agrees that its entitlement to balance provision of Containership carrying capacity with respective use of such Containership carrying capacity is being waived.

(h)     Efficient deployment of the fleet by deploying the Containerships that are operationally appropriate for the contemplated Services.

(i)     Use of Slot entitlements without any geographical restrictions regarding cargo origin and destination, where certain restrictions may be imposed to maintain efficiencies of respective Loops, but always bearing in mind due considerations contemplated for the original Loop design.

## "THE Alliance" Operating Agreement

### 1.    Definitions

| Asia | means | Ports in Asia, excluding Australia and New Zealand |
|---|---|---|
| Adjusted GAS | means | the GAS (defined in the Financial Manual) of each of HLC, ONE and YML as a proportion of the aggregate GAS of HLC, ONE and YML. |
| Banking Day | means | a day (other than a Saturday or a Sunday) on which banks are open for general business in Tokyo, Taipei, Frankfurt, Seoul, New York and Jersey |
| Cascade/ Cascading | means | A change in the deployment of a Containership due to the introduction of a new Containership or a revision of the Service, whereby one or more Containerships are moved from one Loop to another Loop. |
| Coastal Passage | means | A sea passage between any two ports within a Region. |
| Container Operator | means | In respect of cargo, the Line which is the Principal Carrier and which charters Slots from the Ship Operator to carry that cargo under the terms of the Cross Slot-Charterparty set out in Appendix 4 of this Agreement. |
| Container(s) | means | Any standard ISO Container full or empty. |
| Containership | means | Any Containership employed by a Line and committed to the Service in accordance with Clause 6 and listed in Appendix 3 or as from time to time may be agreed between the Lines. |
| Contingency Fund Share | means | A Line or former Line shall be deemed to have a Contingency Fund Share if it would be entitled to any amount from the Contingency Account if the Trust were dissolved on the date specified, as a result of termination of this Agreement in respect of all Lines. |
| Contingency Guarantee | means | a letter of credit from an institution reasonably acceptable to the Lines other than the Line providing it, substantially in the form of one of the letters of credit attached as Appendix 7 |

**"THE Alliance" Operating Agreement**

| Contingency Contribution | means | in relation to each Line, the following USD amounts: |
|---|---|---|

| Line | Percentage share for purposes of Clause 2.11A | Contingency Contribution (USD) |
|---|---|---|
| HLC | 32.505% | 16.253 million |
| ONE | 46.596% | 23.298 million |
| YML | 20.898% | 10.449 million |
| HMM | Not applicable | 25 million |

| | | or (except in respect of HMM) such other contribution as may from time to time apply pursuant to clause 2.11A. |
|---|---|---|
| Contingency Review Date | means | Every 1 April, starting from 1 April 2020, or such other date as the GAS (defined in the Financial Manual) of each Line is adjusted in accordance with the Financial Manual. |
| Dissimilar Substitution | means | Substitution of a Containership with another of dissimilar characteristics where the Substituting Containership and the Substituted Containership are not necessarily provided by the same Line. Dissimilar characteristics for purposes of this definition mean a material difference in Operational Capacity. |
| EXECOM | means | The Committee of the Lines' senior representatives, charged with ensuring that the Lines perform the tasks set out in this Agreement. |
| Europe | means | Ports in Europe including Baltic and Scandinavian countries |
| Financial Manual | means | A document agreed between all Lines containing detailed rules for the financial settlements in relation to the Agreement. |
| Goods | means | the whole or any part of the cargo received from a Line and any Container including an empty Container whether or not the Container is owned or hired by the Line and any cargo and/or Container including an empty Container occupying a Slot allocated to the Line for the Voyage in accordance with Clause 15 of the Agreement. |

## "THE Alliance" Operating Agreement

| | | |
|---|---|---|
| Heads of Agreement (HoA) | means | The Heads of Agreement between the Lines dated and signed June 19th, 2019 |
| ICC | means | Institute Classification Clause currently in effect as published by the International Underwriting Association of London |
| Insolvency Event | means | where a Line (i) is dissolved or has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a solvent consolidation, amalgamation or merger); (ii) becomes insolvent, unable to pay its debts, or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors or any class of them (other than pursuant to a solvent reorganisation, consolidation or amalgamation); (iv) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy, protection pursuant to, or any other relief under, any bankruptcy, insolvency or similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation;  (v) seeks or becomes subject to the appointment of an administrator, receiver, liquidator or other similar official for it or for all or substantially all its assets; (vi) has a secured party take possession of, or has any legal process enforced or taken against, all or substantially all its assets. |
| Interim Period of the Agreement | means | The initial period of the Agreement covering the first 6-9 months where frequent Containership Cascadings are expected |
| Joint Working Procedure | means | The working arrangements which govern the relationship, communication and responsibilities of the Lines in the day-to-day operation of the Services as set out in Clause 38. |
| Loop Allocation Share(s) (LASs) | means | The shares by which the Slots and deadweight capacity of each Containership in the relevant Loop will be allocated and by which the settlement of Slot provision and voyage costs will be determined and calculated. |
| Loop(s) | means | One of the component sailing schedule rotations on one or more of the Trades. |

**"THE Alliance" Operating Agreement**

| | | |
|---|---|---|
| Material Adverse Change | means | the occurrence in relation to a Line of any event or circumstance which, in the reasonable opinion of all the other Lines, has or is reasonably likely to have a material adverse effect on the business, operations and/or financial condition of the affected Line. In forming such opinion the other Lines shall, without limitation, be entitled to take into account the affected Line's interim and/or annual financial reports. |
| Mediterranean | means | Ports in the Mediterranean, including Turkey, Black Sea, Egypt, Israel and the Adriatic |
| Middle East | means | Ports in the Middle East including Persian Gulf. |
| New Containership | means | An additional Containership not listed in Appendix 4 introduced after the Commencement of the Agreement. A New Containership shall be regarded as having been added to Appendix 4 following its acceptance into the Service. |
| North America West Coast | means | Ports at the West Coast of North America, including Canada |
| North America East Coast | means | Ports at the East Coast of North America, including Florida, Mexico, Jamaica, Panama, Canada, and US Gulf area. |
| Off-Hire | means | In accordance with Clause 8 and 10, the period of time during which a Containership temporarily ceases to be provided to the Service or receive the Slot Provision Rate. |
| Old Containership | means | Any Containership (identified in Appendix 4 - as amended from time to time) withdrawn from Service. An Old Containership shall be regarded as having been deleted from Appendix 4 after withdrawal from the Service. |
| On-Hire | means | At any time, but particularly when returning from Off-Hire, the period of time when a Containership is provided to the Service and receives the Slot Provision Rate. |

**"THE Alliance" Operating Agreement**

| | | |
|---|---|---|
| Operating Agreement or this Agreement | means | This Operating Agreement (and where the context admits, the Appendices hereto as the same may be modified from time to time). |
| Operational Capacity | means | The capacity of a Containership as declared by the Ship Operator and which the Ship Operator guarantees will be available under normal operating conditions on the Trade on which the Containership is operating as agreed by the Lines and as further set out in Appendix 4. Operational Capacity includes Slots, deadweight, minimum 20' requirement, maximum 40' requirement, 45' capacity and reefer plug capacity. |
| Operational Deadweight Capacity | means | That element of the Operational Capacity of the Containership referring to its deadweight capacity. |
| Operational Slot Capacity | means | That element of the Operational Capacity of the Containership referring to its Slot capacity. |
| Phase-in Period, Phase-in Schedule and Phase-in Port | means | Respectively: The period at the commencement of the Service or on the introduction of a Line, Trade or Loop between the introduction of the first Containership and the introduction of the last Containership; the agreed sailing schedule for that period; the ports at which Containerships enter the Service as further set out in Clause 11. |
| Phase-out Period, Phase-out Schedule and Phase-out Port | means | Respectively: The period at the end of the Service or on the withdrawal of a Line, Trade or Loop between the withdrawal of the first Containership and the withdrawal of the last Containership; the agreed sailing schedule for that period; the ports at which Containerships leave the Service as further set out in Clause 11. |
| Principal Carrier | means | The Line which is the Carrier under a Transport Document (as defined in Appendix 5) for the carriage of Goods in the Service. |
| Red Sea | means | Ports in the Red Sea |
| Region | means | Either Asia, Europe (inclusive Mediterranean), Middle East (inclusive Red Sea) and North America (North America East Coast and North America Westcoast). |

**"THE Alliance" Operating Agreement**

| | | |
|---|---|---|
| Regional Coordination Committees (RCC) | means | Bodies set up in various locations reporting to the EXECOM and to co-ordinate the activities of the Lines in respect of the management of the Service on a regional basis in accordance with Clauses 25.1 and 25.4. |
| Regional Departure Report | means | Report on the regional departure of a Containership prepared by the Ship Operator in accordance with the Joint Working Procedure. |
| Replaced Containership | means | A Containership which has had to be temporarily withdrawn from service as a result of non-performance in accordance with Clauses 10.4 to 10.10. |
| Replacement Containership | means | A Containership which has been provided by a Line to replace a committed Containership (Replaced Containership) which has had to be temporarily withdrawn from service as a result of Clauses 10.4 to 10.10. A Replacement Containership is not added to Appendix 4 and the Replaced Containership remains the committed Containership and remains listed in Appendix 4. |
| Responsible Line | means | The Line, which may in certain cases be the Ship Operator, whose actionable fault or default gives rise to (i) a third party claim against the Ship Operator or the Containership; or (ii) results in loss or damage to the Containership and/or to Goods carried thereon; or to any other Line(s)'s equipment, as more particularly set out in Clauses 17 – 21. |
| Service | means | The Service operated by the Lines in the Trades, consisting of a number of Loops as agreed from time to time. |
| Ship Operator | means | The Line which is the owner, disponent owner or charterer of the Containership and is operating that Containership in the Service. |
| Similar Substitution | means | Substitution by one Line of a Containership with another of substantially the same characteristics (i.e. no material difference in Operational Capacity) due to the particular requirements of the Ship Operator in accordance with Clause 7.2. |

## "THE Alliance" Operating Agreement

| | | |
|---|---|---|
| Slot Provision Rate | means | The rate expressed in US dollars per Slot-day which is used to settle overall over/under provision of Slots in accordance with Clause 16.4. |
| Slot | means | The space on any Containership or any other Containership for the stowage of Containers. Each slot shall be the space required for the carriage of one standard ISO Twenty Foot Equivalent Unit (TEU). |
| Slot Provision Settlement | means | The settlement procedures relating to the payment by under-providing Lines to over-providing Lines in respect of the structural imbalance of provision in accordance with Clause 16 and The Financial Manual. |
| Slot-day | means | In respect of the provision, allocation or voyage cost settlement relating to a Containership, the measurement unit of one Slot per calendar day. |
| Substituted Containership | Means | A committed Containership which has been substituted by another Containership (the Substituting Containership) which as a result is no longer a committed Containership in accordance with the provisions of Clause 7. |
| Substituting Containership | Means | A Containership which has been provided by a Line in substitution of a committed Containership (the Substituted Containership) and which as a result becomes a committed Containership in its place in accordance with Clause 7. |
| THE Alliance or Alliance | Means | The group of the member Lines of this Agreement as may be amended from time to time by withdrawal, exclusion or suspension or by the addition of further members in accordance with the provisions contained herein. |
| Trade | Means | The sea routes being a segment of the overall co-operation as set out in Clause 3.1, on which each Line has a share based on Slot requirements.

The Trades may be amended by additions or deletions mutually agreed by the Lines from time to time during the term of this Agreement. |

**"THE Alliance" Operating Agreement**

| Trade Allocation Share / Trade Share | Means | The shares in a Trade determined by the Lines and set out in Appendix 3 for 20 2020 and which will be determined for future years in accordance with Clause 13. |
|---|---|---|
| Transport Document | Means | A document issued by a Carrier as defined in Appendix 5  (Cross Slot Charter Party) |
| Turnport | Means | A port, generally at the geographical limits of a roundtrip voyage, where it is deemed that a voyage changes from an Eastbound voyage leg to a Westbound voyage leg or vice versa and where Containerships normally enter or exit a Loop in accordance with Clauses 7, 9 or 12, unless otherwise agreed. |
| Voyage Cost Settlement | Means | The settlement procedures relating to the payment by under-providing Lines to over-providing Lines in a particular Loop to compensate for the operational costs of bunkers, port calls and canal transits undertaken during each voyage in accordance with Clause 16 and The Financial Manual. |
| War Damage | Means | The damage or the repairs of which fail to be covered under the Standard Form of Institute War Risk Insurance. |
| Voyage | means | The sailing of a Containership on a complete rotation of one of the various Loops making up the Service starting from one Turnport and finishing at the same Turnport. |
| Voyage leg | Means | A component part of a Voyage being the sailing of a Containership between a Turnport geographically situated at one end of the Loop and the other Turnport at the other end of the Loop. |
| Voyage sector | Means | A component part of a Voyage leg being the sailing of a Containership between two successive ports in the Loop rotation. |
|  |  |  |

## 2. Period of Agreement

## "THE Alliance" Operating Agreement

2.1     The intended minimum duration of this Alliance shall be ten (10) years commencing from April 1st, 2020 (the "Commencement"). Thereafter, the Agreement will be automatically renewed for an additional 1 (one (1) year term unless terminated in writing by any, Line, or all of the Lines. Any Line shall have the right to issue a twelve (12) months written notice of its intention to withdraw from THE Alliance without financial or other penalty, provided that such notice may not be given before thirty six (36) months having elapsed after the Commencement date of this Alliance.

### Change of Control

2.2     Notwithstanding Clause 2.1, if at any time during the term of this Agreement there shall be a change in the control or a material change in the ownership of any one Line (the Line so affected being referred to in this sub-clause 2.2 only as the "Affected Line") and the other Lines are unanimously of the opinion arrived at in good faith that such change is likely to materially prejudice the cohesion, operation or viability of the Service, then the other Lines may unanimously within six (6) months of the coming into effect of such change give not less than six (6) months' notice in writing to the Affected Line terminating the period of this Agreement in relation to that Line. In the event the Lines fail to reach a unanimous decision to terminate the Affected Line's membership in this Agreement, any individual Line may thereafter give six (6) months' notice in writing of its withdrawal from this Agreement, provided such notice is given within six (6) months of the change of control of the Affected Line.

2.3     For the purposes of Clause 2.2, a change in the control or material change in the ownership of a Line shall mean a change in fifty (50) percent or more of the controlling stock of that Line or its ultimate parent company and not include

   (a)    any public offering of shares in that Line or its holding company, or

   (b)    any shareholder of such Line or its holding company who was a shareholder of such Line or holding company on the effective date of this Agreement acquiring control of such Line or holding company.

### Insolvency / Material Adverse Change

2.4     Upon the occurrence of an Insolvency Event and/or Material Adverse Change in relation to a Line (the Line so affected being referred to in sub-clauses 2.4 to 2.27 as the **"Affected Line"**) and, at any time thereafter, the other Lines may by unanimous agreement and with immediate effect give written notice to the Affected Line to terminate this Agreement, together with any agreement entered into pursuant to Clause 14.4 (a "Cross Slot Charterparty"), with respect to that Line, provided that:

**"THE Alliance" Operating Agreement**

(a)    The other Lines believe in good faith that the Insolvency Event and/or Material Adverse Change may be materially detrimental to the Service, and/or that payment of amounts due at such time or in the future from the Affected Line to any other Line may be delayed or not made in full as a result of the Insolvency Event and/or Material Adverse Change;

(b)    For any Goods being carried under the Transport Documents of any other Line on a Containership provided by the Affected Line, such termination shall be delayed in respect of such Goods to the extent necessary for them to be discharged at their intended port of discharge, or such earlier port in the Loop rotation as that other Line may require;

(c)    For any Goods being carried under the Transport Documents of the Affected Line on a Containership provided by another Line, such termination shall be delayed in respect of such Goods to the extent necessary for them to be discharged at their intended port of discharge, or such other place at which the Goods may be discharged pursuant to the exercise of a Line's rights under Clause 6.4 of the relevant Cross Slot Charterparty.

The Phasing-out provisions in Clauses 11.9 – 11.15 shall not apply to termination under this Clause 2.4 and the other Lines shall provide such replacement Containerships as required to perform the Service.

2.5    Upon the occurrence of an Insolvency Event and/or Material Adverse Change, and without prejudice to their rights under Clause 2.4, provided that the other Lines believe in good faith that the Insolvency Event and/or Material Adverse Change may be materially detrimental to the Service, and/or that payment of amounts due at such time or in the future from the Affected Line to any other Line may be delayed or not made in full as a result of the Insolvency Event and/or Material Adverse Change, the other Lines may at any time thereafter by unanimous agreement require any one or more of the following by giving written notice to the Affected Line:

(a)    That the Affected Line's voting rights under this Agreement shall be suspended, such that for all purposes (i) any majority (e.g. 3:1) decision of the other Lines shall be deemed to be a majority decision of all Lines and (ii) any unanimous decision of the other Lines shall be deemed to be a unanimous decision of all Lines.

(b)    That the Containerships provided by the Affected Line shall be withdrawn from the Service at such ports of call in the Loop rotation and at such times as the other Lines may specify. The Phasing-out provisions in Clauses 11.9 – 11.15 shall not apply to such withdrawal and the other Lines shall provide such replacement Containerships as required to perform the Service.

"THE Alliance" Operating Agreement

(c)     That the Affected Line shall not be entitled to book or present for shipment (even if already booked) any Containers aboard Containerships provided by the other Lines.

(d)     That no other Line shall be obliged to book or present for shipment (even if already booked) any Goods aboard Containerships provided by the Affected Line.

(e)     That the Affected Line shall allow the discharge at any port of call in the Loop rotation of any Goods shipped by any other Line on board any Containership provided by the Affected Line, and shall allow the discharging and reloading of other Goods for the purpose of achieving such discharge.

(f)     That the operation of the adjusting payments mechanism in respect of the Affected Line be suspended.

2.6   Each Line hereby agrees that, if it becomes an Affected Line and the conditions in Clause 2.5 are met, each other Line may make arrangements directly with the Affected Line's agents and sub-contractors (including the head owners of any Containerships which are provided but not owned by the Affected Line), in order to ensure that any Goods shipped by such other Line are carried to, discharged and delivered at their intended discharge port or such earlier port in the Loop rotation as may be required by such other Line.

2.7   If, as a result of an Insolvency Event and/or Material Adverse Change and/or termination pursuant to Clause 2.4 above and/or the exercise of any other Line's rights under Clause 2.5, any other Line reasonably bears more than its share of any costs which in accordance with this Agreement are to be shared between the Lines in proportion to their relevant Trade Lane Allocation Shares or reasonably incurs any costs or expenses in completing the carriage of Goods being carried or to be carried on any Containership provided by the Affected Line or under the Affected Line's Transport Documents (the **"Insolvency/MAC Losses"**), then all of the other Lines shall bear the Insolvency/MAC Losses in proportion to their respective Trade Lane Allocation Shares for the relevant Loop(s).  Insolvency/MAC Losses shall not include amounts that the other Lines can otherwise recover from third parties (other than the Affected Line), including but not limited to the other Lines' respective insurers. Any amount not recovered from insurers as a result of policy deductibles shall be considered to be recovered for the purposes of this sub-clause.  The Affected Line shall indemnify each other Line in respect of any costs and/or expenses reasonably incurred as a result of an Insolvency Event, Material Adverse Change and/or such other Line's exercise of any rights under Clauses 2.4 and/or 2.5.

2.8   The other Lines may require the matters set out in Clause 2.5 only for so long as the conditions in Clause 2.5 continue to apply, except that any requirement for the

## "THE Alliance" Operating Agreement

Affected Line to withdraw Containerships shall remain valid provided it was given at a time when the conditions in Clause 2.5 apply.

2.9   If this Agreement is terminated in relation to any Line under this Clause 2 or if any Line withdraws from this Agreement (a) all Lines shall continue to be liable to one another in respect of all liabilities and obligations accrued prior to termination, and (b) this Agreement shall remain in force in relation to the remaining Lines. If this Agreement is terminated in relation to any Line under this Clause 2, the remaining Lines shall discuss in good faith and agree to any amendments to this Agreement necessitated by such termination.

2.10  Each Line hereby agrees that, if it becomes an Affected Line, it shall procure that Containerships provided by it shall continue to make port calls in accordance with this Agreement, notwithstanding any risk that those Containerships will be arrested or otherwise detained.

Contingency Account

*Parties' Rights and Obligations*

2.11  Each Line shall within thirty (30) days of this amended Clause 2.11 and the variation of the Trust (as defined below) having become effective:

(a)   Save to the extent already deposited by that Line, deposit the sum of USD 1 million into an account (the **"Contingency Account"**) held by the trustees (the **"Trustees"**) of the Alliance Purpose Trust (the **"Trust"**), a trust created by the Lines on the terms set out in the deed attached at Appendix 6 (the **"Deed"**)  as varied on the terms set out in the instrument attached at Appendix 8; and

(b)   provide the balance of its Contingency Contribution by either, at its option: depositing a further sum into the Contingency Account; or procuring a Contingency Guarantee or Contingency Guarantees (which may include a Contingency Guarantee previously provided under this clause); or by any combination of the two.  For the avoidance of doubt, each Line may at its discretion determine how much of the balance of its Contingency Contribution shall be made up of deposits into the Contingency Account and how much shall be covered by a Contingency Guarantee or Contingency Guarantees.

The Contingency Account (including any funds therein) and any Contingency Guarantees shall be held by the Trustees on the terms of the Trust for all Lines and shall be applied in accordance with the terms of this Agreement and the Deed.  As further set out in the Deed, cash deposited by the Lines shall be held by the Trustees in a bank account or accounts as cash so as to be available within one Banking Day unless otherwise agreed by each Line and by each former Line that has a Contingency Fund Share at the time of such agreement.  Unless otherwise specified, terms which

**"THE Alliance" Operating Agreement**

are capitalised in Clauses 2.12-2.27 below but not defined in this Agreement shall have the meaning given to them in the Deed or Contingency Guarantees, as the case may be.

2.11A   The following clause 2.11A does not apply in respect of HMM, whose Contingency Contribution shall remain as set out in clause 1 throughout the term of this Agreement. Within 30 days after each Contingency Review Date, HLC, ONE and YML shall review, and if necessary adjust, the amount of each of their Contingency Contributions in accordance with this clause.  If the Adjusted GAS of HLC, ONE and/or YML at such Contingency Review Date has changed by more than 5% compared to its Adjusted GAS on the previous Contingency Review Date (or compared to the percentage set out in Clause 1 if there has not yet been a Contingency Review Date), the Contingency Contributions of HLC, ONE and YML shall be adjusted to reflect the Adjusted GAS at such date as a proportion of USD 50m.

2.11B   Within 45 days after each Contingency Review Date, the Committee (acting unanimously) shall forthwith notify the Trustees of any adjustment to the Contingency Contribution of any Line(s) under clause 2.11A.

2.11C   If a Line's Contingency Contribution changes pursuant to clause 2.11A then:

(a)   if the amount of that Line's Contingency Contribution has increased, it shall within 60 days after the relevant Contingency Review Date provide the balance of its Contingency Contribution by either, at its option: depositing a further sum into the Contingency Account; or procuring a Contingency Guarantee or Contingency Guarantees (which may include a Contingency Guarantee previously provided and/or replacement of any existing Contingency Guarantee pursuant to Clause 2.17(ee)); or by any combination of the two;; or

(b)   if the amount of that Line's Contingency Contribution has decreased, the Line may request a payment from the Contingency Account and/or to replace one or more Contingency Guarantees in accordance with the provisions of Clause 2.17 below whether or not, at the time of giving a notice or notices under that Clause, that Line is an Affected Line.

2.12   If the Committee, acting unanimously (as defined in Clause 2.12(d)), believes (i) that for the purpose of clauses 2.12-2.27 a Line ("the Certified Affected Line") has become an Affected Line, and (ii) that disbursements should be made from the Contingency Account:

## "THE Alliance" Operating Agreement

(a)     The Committee, acting unanimously (as defined in Clause 2.12(d)) under this Clause 2.12 may give written notice(s) to the Trustees (a) certifying that the Certified Affected Line has become an Affected Line, (b) identifying the disbursements (with details of the recipient(s) and amount(s)) that are required to be made from the Contingency Account, and (c) certifying that such disbursements comply with the provisions of Clause 2.12 (b) of this Agreement.

(b)     The Committee, acting unanimously (as defined in Clause 2.12(d)), shall only require disbursements to be made from the Contingency Account:-

(i)     To pay any costs, losses or liabilities reasonably incurred by the other Lines as a result of any breach of Clause 2.10 above; and

(ii)    To advance such funds or make such payments (whether on behalf of the Certified Affected Line or otherwise) in respect of (a) the carriage, handling, storage and delivery of any Goods shipped by the other Lines on board Containerships provided by the Certified Affected  Line (including, for the avoidance of doubt, operating costs of such Containerships) and/or (b) any claims by third parties which lead or may otherwise lead to the arrest or detention of such Containerships, in each case as may reasonably be required to ensure that such Goods can be carried to and delivered at their intended discharge port without delay, or such earlier port in the Loop rotation as may be required by the relevant Container Operator;

(iii)   To reimburse a Line in respect of funds paid or advanced by it where the Committee agree, by unanimous decision (as defined in Clause 2.12(d)), that such payments or advances fall into one or more of the categories listed in sub-clauses (i) and (ii) above and should be reimbursed to that Line.

(c)     The Trustees will not be obliged to check the accuracy of any notice under this Clause, which shall be conclusive as to its contents except in case of fraud.

(d)     For the purpose of this Clause 2.12, (i) the Committee acts unanimously if all Committee members, other than the Committee member appointed by the Certified Affected Line, agree and (ii) the Committee member appointed by the Certified Affected Line may not vote whether or not its voting rights have been suspended under clause 2.5(a).  For the avoidance of doubt,

**"THE Alliance" Operating Agreement**

for the purposes of this Clause 2.12, the Committee may act unanimously without any prior notice to the proposed Certified Affected Line and without the participation of the Certified Affected Line in any related Committee meeting or meetings.

2.13    Within thirty (30) days of any funds being disbursed in accordance with Clauses 2.12 above (and Clause 2.17(a) below), the Lines shall pay into the Contingency Account the amount of such disbursements in accordance with their respective liability under this Agreement to pay for such amounts.  For the avoidance of any doubt, this Clause applies to a Certified Affected Line as well as each Line that is not a Certified Affected Line in case such Line is liable under this Agreement in respect of the said disbursement amounts.  On termination of this Agreement with respect to a Line pursuant to Clause 2.4, the provisions of this clause shall continue to apply to that Line for a period of three hundred and sixty (360) days after termination for all disbursements made during such period in connection with the Insolvency Event or Material Adverse Change for which such termination occurred.

2.14    Without prejudice to the obligations under Clause 2.13, if at any time the aggregate of (a) the total funds in the Contingency Account (excluding accrued interest or other proceeds of investment) and (b) the value of any Contingency Guarantees, falls below the equivalent of the Contingency Contribution for each Line that is not at that time a Certified Affected Line, and the time for any payment(s) to be made under Clause 2.13 has expired, then such Lines shall within thirty (30) days deposit in proportion to the Contingency Contributions the amount necessary to make good such shortfall.  If a deposit is required under this Clause but the Contingency Contribution of such Line(s) is adjusted under Clause 2.11A before the time for making such deposit has expired, the amount (if any) to be deposited shall be re-calculated on the basis of the adjusted Contingency Contribution of such Line(s).  For the avoidance of any doubt, this Clause applies only to each Line that is not at that time a Certified Affected Line even though such Line did not cause such shortfall.

2.15    The Committee (acting unanimously, as defined in Clause 2.12(d) above), shall as soon as is reasonably practicable notify the Trustees of (a) any amounts that are required to be paid pursuant to Clauses 2.13 and 2.14 above, (b) the Line(s) that are required to make such payment(s) and (c) the date(s) by which such payment(s) are due.

2.16    (a) If, under any Contingency Guarantee that is substantially in the form of Appendix 7 - Form A, an Issuer sends a Non-Extension Notice (as defined in the Contingency Guarantee) to the Beneficiary, the Line that procured the provision of such Contingency Guarantee shall procure either (a) the withdrawal of the Non-Extension Notice or (b) the provision of a new Contingency Guarantee for the same amount or (c) deposit a sum

## "THE Alliance" Operating Agreement

equivalent to the amount covered by such Contingency Guarantee into the Contingency Account, in each case by no later than thirty (30) days prior to the Expiry Date of the Contingency Guarantee. Where this Agreement is terminated with respect to a Line pursuant to Clause 2.4, this clause shall continue to apply to that Line for a period of three hundred and sixty (360) days following termination.

(b) If a Line provides a Contingency Guarantee substantially in the form of Appendix 7 - Form C, it shall by no later than twelve (12) months  prior to the Expiry Date of the Contingency Guarantee either (a) procure the provision of a new Contingency Guarantee for the same amount or (b) deposit a sum equivalent to the amount covered by such Contingency Guarantee into the Contingency Account.  Where this Agreement is terminated with respect to a Line pursuant to Clause 2.4, this clause shall continue to apply to that Line for a period of three hundred and sixty (360) days following termination.

(c) If a Line that has provided a Contingency Guarantee substantially in the form of Appendix 7- Form C does not comply with the provisions of clause 2.16(b), the other Lines may by unanimous agreement give 11 (eleven) months' written notice to that Line to terminate this Agreement, together with any Cross Slot Charterparty in force at the expiry of such notice, with respect to that Line.

*Payments out of the Contingency Account and Replacement of Contingency Guarantees*

2.17    The Lines hereby agree that funds shall be disbursed from the Contingency Account as follows:-

(a)    Upon the Trustees' receipt of notice(s) in accordance with Clause 2.12 above, they shall pay the identified recipient(s) the amount(s) specified in the notice(s);

(b)    Upon the Trustees' receipt of (i) a written notice from a Line stating the amount of its share of the Contingency Account that exceeds USD 1 million, confirming that all disbursements that the Committee has required to be made under clause 2.12 have been made, and requesting to replace such amount or part of such amount with a Contingency Guarantee or Contingency Guarantees and (ii) the original of such Contingency Guarantee(s), the Trustees shall send copies of the notice and Contingency Guarantee(s) to any Line or former Line that has a Contingency Fund Share  at the time of receipt such notice.  If within fourteen (14) days thereafter, the Trustees:-

**"THE Alliance" Operating Agreement**

(i)    Receive any objection(s) from any Line or any such former Line disputing the acceptability of the bank that has provided the Contingency Guarantee or any of the Contingency Guarantees, or disputing that all disbursements that the Committee has required to be made under clause 2.12 have been made at the date of the notice, no payment shall be made to the requesting Line pending either the withdrawal of the objection(s) or the publication of a final award or judgment as to the disputed matters (such award or judgment must be binding on all Lines, and must not be the subject of any appeal or be capable of being appealed);

(ii)    Receive any objection(s) from any Line or any such former Line disputing the amount of the requesting Line's share exceeding USD 1 million as stated in the notice, the Trustees shall pay any undisputed amount to the requesting Line but defer any payment of the disputed amount pending either the withdrawal of the objection(s) or the publication of a final award or judgment as to the amount due to the requesting Line (such award or judgment must be binding on all Lines, and must not be the subject of any appeal or be capable of being appealed);

(iii)    Do not receive any objection(s) from any Line or any such former Line, the Trustees shall pay the requesting Line the amount of its share exceeding USD 1 million as stated in the notice.

(c)    Upon the Trustees' receipt of a written notice from a Line stating (i) that this Agreement has been terminated with respect to it, (ii) whether such termination is pursuant to Clause 2.4 or otherwise and (iii) the amount of its share of the Contingency Account, the Trustees shall send copies of such notice to any Line or former Line that has a Contingency Fund Share at the time of receipt of such notice. If, within fourteen (14) days thereafter, the Trustees:-

(i)    Receive any objection(s) from any Line or any such former Line disputing whether there has been a termination or the grounds of termination, no payment shall be made pending either the withdrawal of the objection(s) or the publication of an award or judgment as to the disputed matters (such award or judgment must be binding on all Lines, and must not be the subject of any appeal or be capable of being appealed);

(ii)    Receive any objection(s) from any Line or any such former Line disputing the amount of the departing Line's share as stated in the notice, the Trustees shall pay any undisputed amount to the

**"THE Alliance" Operating Agreement**

departing Line but defer any payment of the disputed amount pending either the withdrawal of the objection(s) or the publication of an award or judgment as to the departing Line's share (such award or judgment must be binding on all Lines, and must not be the subject of any appeal or be capable of being appealed);

(iii)   Do not receive any objection(s) from any Line or any such former Line, the Trustees shall pay the departing Line the amount of its share as stated in the notice.

(d)   Upon the Trustees' receipt of a written notice from all members of the Committee which confirms that this Agreement has been terminated with respect to all Lines and either (i) includes a statement agreed by each Line and each former Line that has a Contingency Fund Share at the time of such notice as to the shares due to each of them or (ii) is accompanied by a copy of a final award or judgment as to such shares (such award or judgment must be binding on all Lines, and must not be the subject of any appeal or be capable of being appealed), the Trustees shall pay each Line and each such former Line their respective shares in accordance with the agreed statement or the award or judgment, as the case may be.

(e)   Upon the Trustees' receipt of a written notice from a Line stating (i) that the total amount deposited by that Line to the Contingency Account plus the amount covered by a Contingency Guarantee or Contingency Guarantees procured by that Line exceeds the amount of its Contingency Contribution, (ii) the amount of such excess, (iii) the amount by which it wishes its share of the Contingency Account to be reduced (being an amount that will leave at least a contribution to the Contingency Account from that Line of at least USD 1 million); and (iv) that it is not an Affected Line, the Trustees shall send copies of the notice to every Line and former Line that has a Contingency Fund share at the time of receipt of such notice.  If within fourteen (14) days thereafter, the Trustees:-

(i)   Receive any objection(s) from any Line or any such former Line disputing the amount of such excess as stated in the notice, the Trustees shall pay any undisputed amount to the requesting Line but defer payment of the disputed amount pending either the withdrawal of the objection(s) or the publication of a final award or judgment as to the amount due to the requesting Line (such award or judgment must be binding on all Lines, and must not be the subject of any appeal or be capable of being appealed);

(ii)   Do not receive any objection(s) from any Line or any such former Line, the Trustees shall pay the requesting Line the amount stated

"THE Alliance" Operating Agreement

in the notice provided that the requesting Line is not an Affected Line.

(ee)   Upon the Trustees' receipt of (i) a written notice from a Line stating that it wishes to replace one or more Contingency Guarantees because the amount covered by all Contingency Guarantees that it has provided exceeds the amount of its Contingency Contribution minus the total amount deposited by that Line to the Contingency Account and that it is not an Affected Line, and (ii) the original of one or more replacement Contingency Guarantees, together with any other Contingency Guarantees already procured by that Line covers that Line's Contingency Contribution minus the total amount deposited by that Line to the Contingency Account, the Trustees shall send copies of the notice and any replacement Contingency Guarantee to any Line or former Line that has a Contingency Fund Share at the time of receipt of such notice.  If within fourteen (14) days thereafter, the Trustees:

(i)     Receive any objection(s) from any Line or any such former Line disputing the acceptability of the replacement Contingency Guarantee(s), or disputing that all disbursements that the Committee has required to be made under clause 2.12 have been made at the date of the notice, the Trustees shall not accept the replacement Contingency Guarantee(s) pending either the withdrawal of the objection(s) or the publication of a final award or judgment as to the disputed matters (such award or judgment must be binding on all Lines, and must not be the subject of any appeal or be capable of being appealed);

(ii)    Do not receive any objection(s) from any Line or any such former Line, the Trustees shall accept the replacement Contingency Guarantee(s) and return the Contingency Guarantee(s) that is/are being replaced to the Issuer(s), provided that the Line that sent the written notice stating that it wishes to replace a Contingency Guarantee is not an Affected Line.

(f)    The Lines agree that they will not object unreasonably to any notice given under Clause 2.17.  However any failure to comply with this requirement shall not make an objection invalid and the Trustees shall not be required to determine whether an objection is unreasonable.

*Calculation of Payments to Lines*

2.18    For the purposes of Clause 2.17(b), the requesting Line's share shall be the amount to which it would be entitled if this Agreement were terminated

## "THE Alliance" Operating Agreement

with respect to it (other than pursuant to Clause 2.4) on the date on which the original of the Contingency Guarantee(s) provided pursuant to that clause is/are received by the Trustees.

2.19 For the purposes of Clause 2.17(c), where the termination of this Agreement with respect to the departing Line is not pursuant to clause 2.4:-

(a) The share of each Line (including the departing Line) shall be calculated at the date of termination (the "**Calculation Date**") as follows:-

(i) The aggregate of:-

- any amounts deposited by that Line into the Contingency Account pursuant to Clauses 2.11, 2.11C(b) and 2.14;

- any amounts received by the Trustees pursuant to demands for payment made under any Contingency Guarantee procured by that Line.

(ii) Less:-

- any amounts previously paid to that Line pursuant to Clause 2.17(b) or (e);

- for disbursements made from the Contingency Account before the Calculation Date, any amounts which that Line should have deposited pursuant to Clause 2.13 but has not done so, or which it would have become liable to deposit pursuant to Clause 2.13 if the 30 day period in that Clause had expired before the Calculation Date; and

- a share of the ordinary running costs of the Trust to be calculated on a pro rata basis by reference to the duration of that Line's membership of the Alliance, to the extent not already paid;

(iii) Where the amount calculated under Clause 2.19(a)(i)-(ii) and (b) with respect to any Line(s) or former Line(s) is negative, then without prejudice to that Line's liability to make any deposits that are due, such amount shall, in equal shares, be deducted from the amounts calculated with respect to any other Lines or former Line(s).

(b) The share of any former Line shall be calculated at the Calculation Date as the aggregate of:

## "THE Alliance" Operating Agreement

(i)     any amount to which it is entitled but which has not yet been paid; and

(ii)     if this Agreement was previously terminated in relation to such Line under Clause 2.4 but the three hundred and sixty (360) day period in Clause 2.20(a) had not expired at the Calculation Date, the amount calculated under Clauses 2.20(a) and 2.21 below, as if such period had expired at the Calculation Date.

(c)     After the date of termination, any Contingency Guarantee provided by the departing Line shall be returned by the Trustees to the Issuer and no demands shall be made by the Trustees under it unless the amount calculated under sub-paragraphs (a) and (b) of this Clause is negative, in which case the Trustees shall immediately demand payment in the amount of the shortfall from the departing Line and the departing Line shall make such payment within three Banking Days of receiving the Trustees' demand.  If the Trustees do not receive such payment, they shall immediately demand payment in full under any Contingency Guarantee or Guarantees provided by the departing Line and remit any balance to the departing Line.  If the departing Line has provided more than one Contingency Guarantee and it is not necessary to demand payment under all of them in order to pay the amount required by the Trustees, then the Trustees may at their absolute discretion select the Contingency Guarantee or Guarantees under which payment will be demanded.

2.20   For the purposes of Clause 2.17(c), where the termination of this Agreement with respect to the departing Line is pursuant to clause 2.4:-

(a)     The departing Line's share of the Contingency Account (excluding accrued interest and investment proceeds) shall be calculated in accordance with Clause 2.19(a) except that the Calculation Date shall be  three hundred and sixty (360) days following the date of termination;

(b)     After the expiry of three hundred and sixty (360) days following the date of termination, any Contingency Guarantee provided by the departing Line shall be returned by the Trustees to the Issuer and no demands shall be made by the Trustees under it, unless the amount calculated under sub-paragraphs (i) and (ii) of Clause 2.19 is negative, in which case the Trustees shall immediately demand payment in the amount of the shortfall from the departing Line and the departing Line shall make such payment within three Banking Days of receiving the Trustees' demand.  If the Trustees do not receive such payment, they shall immediately demand payment in full under any Contingency Guarantee or Guarantees provided by the departing Line and remit any balance to the departing Line.  If the departing Line has provided more

### "THE Alliance" Operating Agreement

than one Contingency Guarantee and it is not necessary to demand payment under all of them in order to pay the amount required by the Trustees, then the Trustees may at their absolute discretion select the Contingency Guarantee or Guarantees under which payment will be demanded.

2.21   In addition to any sum calculated in accordance with Clauses 2.19 and/or 2.20 above, and at the same time as such sums are paid, the departing Line is also to be paid a share of any interest or other investment proceeds that have accrued at the time of termination, being in the same proportion as its share of the total funds in the Contingency Account (excluding accrued interest and investment proceeds) during the time(s) when such investment proceed(s) accrued.

2.22A   For the purposes of Clause 2.17(d):-

(a)   Each Line or former Line's share of any funds remaining in the Contingency Account shall be the aggregate of:-

(i)   for each Line, an amount calculated in accordance with Clauses 2.19(a) and 2.21 above, except that the Calculation Date shall be the date on which this Agreement was terminated with respect to all Lines;

(ii)   for each Line or former Line, any amounts to which it is already entitled but which have not yet been paid;

(iii)   for each former Line in respect of which this Agreement was previously terminated under Clause 2.4 but the three hundred and sixty (360) day period in Clause 2.20(a) had not expired at the time of termination of this Agreement, any amounts to which it would be entitled under Clauses 2.20(a) and 2.21 above, if such period had expired at the time of termination of this Agreement; and

(iv)   for each Line an equal share of any balance of funds in the Contingency Account following such distribution.

(b)   After the date of termination, any Contingency Guarantee provided by a Line shall be returned by the Trustees to the Issuer and no demands shall be made by the Trustees under it unless the amount calculated under sub-paragraph (a) is negative, in which case the Trustees shall immediately demand payment in the amount of the shortfall from that Line and that Line shall make such payment within three Banking Days of receiving the Trustees' demand.  If the Trustees do not receive such payment, they shall immediately demand payment in full under any Contingency Guarantee or Guarantees provided by the Line and remit any balance to the Line.  If the departing Line has provided more than

## "THE Alliance" Operating Agreement

one Contingency Guarantee and it is not necessary to demand payment under all of them in order to pay the amount required by the Trustees, then the Trustees may at their absolute discretion select the Contingency Guarantee or Guarantees under which payment will be demanded.

2.22B    For the purposes of Clause 2.17(e) the requesting Line's share shall be the amount to which it would be entitled under Clause 2.22A(a)(i) and (ii) if the Agreement were terminated in relation to all Lines at the time of the request.

*Operation of Contingency Account*

2.23    Funds shall only be disbursed pursuant to Clause 2.17(a) from the sums that (i) the Lines deposit into the Contingency Account or (ii) are received into the Contingency Account pursuant to any demands under any Contingency Guarantees, and not from any accrued interest or other proceeds of investment, which shall be accounted for separately.

2.24    Within three Banking Days of any notice(s) being given to the Trustees pursuant to Clause 2.12, each Line in respect of which the Trustees are holding a Contingency Guarantee or Guarantees shall deposit the amount covered by such Contingency Guarantee(s) into the Contingency Account.  If the Trustees:-

(a)    receive such deposit from a Line as above, any Contingency Guarantee provided by that  Line shall be returned by the Trustees to the Issuer and no demands shall be made by the Trustees under it;

(b)    do not receive such deposit from a Line as above, the Trustees shall immediately demand payment in full under any Contingency Guarantee provided by that Line.

2.25   (a) If:

(i) the Trustees receive a Non-Extension Notice in respect of any Contingency Guarantee that is substantially in the form of Appendix 6 - Form A and the Trustees have not, by no later than fifteen (15) days prior to the Expiry Date, either received a notice from the Issuer withdrawing such Non-Extension Notice or been provided with a new Contingency Guarantee by the relevant Line; or

(ii) a Line that has provided a Contingency Guarantee substantially in the form of Appendix 6 - Form B has not at least 15 days before its Expiry Date provided a new Contingency Guarantee to the Trustees;

**"THE Alliance" Operating Agreement**

the Trustees shall promptly demand that such Line deposits the amount covered by that Contingency Guarantee into the Contingency Account and the Line shall do so within three Banking Days of receiving the Trustees' demand.

(b) If the Line:-

(i) makes such deposit as above, the Contingency Guarantee shall be returned by the Trustees to the Issuer and no demands shall be made by the Trustees under it;

(ii) fails to make such deposit as above, the Trustees shall immediately make a demand for payment in full under such Contingency Guarantee.

2.26 Any amounts which are to be paid to a Line pursuant to Clauses 2.17(b)-(e) above should be paid as soon as practicable

2.27 If this Agreement is:

(a) terminated in relation to any Line by reason of that Line's breach (whether or not that Line is an Affected Line at that time); or

(b) terminated in relation to, rejected, or disclaimed by a Line, whether by operation of law or at the election of the Line (or any liquidator, trustee in bankruptcy, receiver, administrative receiver, administrator, compulsory manager or other similar officer appointed to it or in respect of all or substantially all of its assets) in any insolvency, bankruptcy or analogous proceeding;

then for the purposes of Clauses 2.11-2.26 such termination will be deemed to have occurred pursuant to Clause 2.4.

2.28 For all U.S. related trades the Contingency Guarantee shall not become operative until the respective amendment to the FMC agreement is effective.,

## 3. Scope

3.1 The Lines will operate as the "THE Alliance", serving as leading alliance to operate an enhanced Service network in the following Trades:

Asia – Europe & vice versa
Asia – Mediterranean/Adriatic/Black Sea & vice versa
Asia – North America East Coast via Panama Canal and via Suez Canal, The Cape of Good Hope and vice versa
Asia – North America West Coast & vice versa
Asia – North America West Coast – Asia – West India & vice versa (pendulum)
Europe/Mediterranean – North America/Mexico East Coast & vice versa

**"THE Alliance" Operating Agreement**

Asia – Middle East, Persian Gulf and Red Sea & vice versa

As HMM has no demand to participate in the Europe/Mediterranean – North America Trade Lanes, HMM will have zero allocation or voting rights for the services in this Trade Lane operated under this Agreement.

Existing non-Alliance Services between India/Pakistan and Europe, as well as India/Pakistan and North America and Services covering multiple Trades of those existing non-alliance Services are excluded from the scope. The Lines agree that they will from time to time and in good faith discuss the possibility of including Services which are currently outside the scope of this Agreement

The Scope shall also include intermediate port calls at Balboa, Panama; Manzanillo, Panama and Cartagena, Colombia, for Services operated via Panama Canal as the case may be and as further defined in Appendix 2 of this Agreement.

3.2     It is intended that all Lines will jointly operate Loops covering the Trades provided.

3.3     It is intended that the Service will provide sufficient space to cover the Lines' respective requirements for the expeditious and efficient movement of cargo; provided, however, that the Lines may negotiate and agree upon different allocations from time to time depending on the Lines' respective needs.

3.4     Where a member Line wishes to introduce a new Service falling within the scope of the defined Trades, and THE Alliance has not agreed by unanimous agreement to include such Service as an Alliance Service, the Line introducing this new Service may offer space on this new Service to another interested individual Alliance member Line(s) which shall have a right of first refusal and also to third party liner operators. The tonnage and capacity comprising this new non-Alliance Service shall not be counted as a contribution of tonnage or capacity to THE Alliance, nor shall the use of such non-Alliance Service by a Line be counted as use of Alliance Basic Slot Allocation ("BSA").

3.5     The Lines may upon future agreement in writing further expand the scope of cooperation beyond that stipulated in Clause 3.1 above.

3.6     The Lines shall use their best endeavours to terminate any third party arrangements in the defined Trades existing at the time of the Commencement. If such termination is not possible at the time of the Commencement, the Lines may continue to operate existing Services within the scope of the defined Trades and to modify such existing Services from time to time. Any such continued third party arrangement shall preferably only be maintained until such time a termination is possible

3.7     Use of Containerships for Cargo subject to Flag Preference Laws

**"THE Alliance" Operating Agreement**

a. Any U.S. flag Containership may call at any U.S. port in connection with the carriage of U.S. military or other cargo reserved by law or contract with the United States of America for carriage by U.S. flag Containerships. Notwithstanding any other provision of this Agreement, no Line shall have the right to use or make available space on the Containership of any other Line for the carriage of cargo reserved by the cargo preference laws of the country of registry of such Containership including cargo reserved by United States law for Containerships of the United States.

b.

(i) Notwithstanding any other provision of this Agreement, Hapag-Lloyd (USA) LLC (HLUSA) ("U.S.-Flag Operator)") shall retain authority to determine the routes, schedules, and space availability of their respective U.S.-flag Containership covered under this Agreement as may be required to fulfil their respective obligations under their contracts with the United States government; provided, however, that the U.S.-Flag Operator shall to the extent practicable provide the other Lines with prompt notice of any change in their respective U.S.-flag Containership routes, schedules, or space availability and advise and consult with the other Lines regarding such routes, schedules, and space availability. Furthermore, in the event that the U.S.-flag Containership(s) covered by this Agreement and employed by the U.S.-Flag Operator or space on such Containership(s) is activated under any stage of the Voluntary Intermodal Sealift Agreement ("VISA") and contracts implementing VISA, the U.S.-Flag Operator may make such Containership(s) or space thereon available to the U.S. government without liability to any Line hereunder, notwithstanding any other provision of this Agreement.

(ii) In the event the U.S.-Flag Operator effectively withdraws capacity utilized under this Agreement as a result of the exercise of the provisions in the previous paragraph concerning its U.S.-flag Containerships, the normal non-performance rules will not apply. The Lines shall promptly agree on revised Loop Allocation Shares, Loops, Containership provision, and similar terms, taking into consideration such U.S.-Flag Operator's reduced Containership provision, as well as the overall over-under provision position of the individual Lines hereunder.

**4.      Marketing**

4.1      Each Line shall be responsible for marketing its own interests in the Trades.

**5.      The Services**

5.1      The Lines shall initially provide the Services as set out in Appendix 2. Regular reviews of the Services shall be conducted and changes shall be agreed, where

"THE Alliance" Operating Agreement

necessary, in order to maintain a high quality product network covering the Lines' respective and collective requirements.

5.2     Changes in pro forma schedules shall be subject to majority decision (as defined in Clause 25) provided that Lines adversely affected by the change shall be entitled to receive reasonable adjustments to Loop Allocation Shares, Slots on other Loops or other operational accommodation(s) to mitigate the adverse consequences of the change on such Lines.

## 6.     Provision of Containerships

6.1     Notwithstanding   the stipulations outlined in regards to HMM's provision in the vision statement term (g), each Line shall be required to provide Containerships and capacity sufficient to satisfy their respective shares of the Lines in respect of the agreed-upon Services. Such Containerships shall be appropriate, in terms of size, configuration and performance capabilities, to meet the agreed-upon requirements for such Services.

6.2     The Lines agree to deploy Containerships under a "Best ship for the Loop" practice and on the route for which they are best suited, in an effort to minimize saw tooth effects and allow as much as possible homogeneous use of Lines respective Operational Capacities. The suitability criteria will include, inter alia, the TEU and deadweight size and speed of the Containerships together with other standards relevant to the Loop such as the 20', 40', 45', reefer plugs for 20' and 40' reefer Containers, voltage, flag, age and efficiencies. The criteria will be measured against the equivalent characteristics of other Containerships employed on the same Loop. It is the intention of the Lines that the Service shall provide, to the extent reasonably possible, consistent Service from week to week

6.3     Nothing shall preclude a Loop being furnished by Containerships operated by a single Ship Operator, provided that all other conditions of Clause 6.2 are met in full.

For clarification and following the practice of "best ship for the Loop", the a Containership contributed by a Line may be employed in any Trade and in any Loop within a Trade, irrespective of whether the Ship Operator of the Containership enjoys Slot allocation in the Trade or Loop.

6.4     The Containerships committed and accepted for employment at the commencement of the Service are set out in Appendix 4.

Thereafter New Containerships not listed in Appendix 4 shall be accepted into the Service in accordance with Clause 7. The Lines shall also agree upon the Operational Capacities at the time of approval.

The Lines shall regularly review and agree to a Cascade of Containership line up necessary for the requirement of the Alliance, taking into consideration Clause 6.2, delivery of new Containerships and any new Containerships that the Lines would like to provide to the fleet in accordance with Clause 7. Unless otherwise

"THE Alliance" Operating Agreement

agreed by the Lines, the agreed Cascade and the agreed provisions of Containerships shall not change.

The Lines shall commit to building (or otherwise acquiring, including chartering) New Containerships to satisfy their respective growth in Slot requirements in a planned manner and after consultation. In this context the Lines have already advised their intention to build certain new Containerships which are additionally listed in Appendix 4. Containerships that do not comply with ICC requirements shall not be deployed.

6.5     Subject to the provisions of Clause 7, once a Containership has been accepted for the Service it becomes committed and each Line has a prime responsibility for maintaining the number of Containerships provided and any change to this number can only be made with the express agreement of the other Lines. Failure to provide a Containership on the date or at the port agreed will constitute Non-Performance subject to the conditions of Clause 10 below.

6.6     The Lines shall meet and confer periodically regarding drydocking schedules and the provision of substitute tonnage. The Lines recognize that in the event of dry-docking of larger tonnage (Containerships in excess of 10,000 TEU), the Line providing the Containership may not be able to replace such Containership with equivalent tonnage. In such event the Lines shall allocate temporary replacement capacity in proportion to their structural LAS for the affected Loop.


**7.      Changes in the Fleet**

7.1     The Containerships committed to the Service at the Commencement of this Agreement as set out in Appendix 4 may change over the period of this Agreement as a result of:

(a)     The substitution of Containerships:

      (i)     Similar Substitution - substitution by one Line of a Containership with another of substantially the same characteristics due to the particular requirements of the Ship Operator.

      (ii)    Dissimilar Substitution - substitution of a Containership with another of dissimilar characteristics where the Substituting Containership and the Substituted Containership are not necessarily provided by the same Line;

(b)     The introduction or withdrawal of Trades/Loops;

(c)     The introduction of additional Containerships and/or the withdrawal of Containerships where the Lines agree to increase or reduce the number of Containerships employed on an individual Loop.

(d)     Temporary replacements for maintenance and drydocking coverage shall not be covered under this Clause 7

## "THE Alliance" Operating Agreement

<u>Similar Substitution triggered by one Line</u>

7.2    A Ship Operator may substitute any of its committed Containership by a Substituting Containership provided that:

(a)    The other Lines are notified 90 days prior to the intended substitution. In the event that this is not practical then as soon as possible thereafter and in any case no later than 30 days prior to the intended substitution;

(b)    The classification of the Substituting Containership, its Operational Capacity (including reefer capacity), speed, technical compatibility and any other relevant data comply with standards from time to time set out in the Joint Working Procedure such as but not limited to AMP fitting, Panama chock ;

(c)    The Operational Capacity of the Substituting Containership is within the range of the class of the Substituted Containership as defined in Appendix 4;

(d)    The speed of the Substituting Containership is capable of running the proforma schedule of the Loop;

(e)    The number of Containerships deployed in the Service remains unchanged;

(f)    The sailing schedule of the Loop remains unchanged; and

(g)    No Cascade is caused by the substitution.

7.3    At the same time as giving notice of its intention to introduce a Substituting Containership a Line must also:

(a)    Advise at the earliest opportunity the full description of the Substituting Containership (including name);

(b)    Commit to the date of substitution and intended change-over port;

(c)    Suggest a plan for schedule coverage including transhipment arrangements if required.

7.4    All costs and other consequences arising from a Similar Substitution shall be applied in accordance with Clause 7.17 to Clause 7.20.

7.5    Any substitution not complying with the above requirements shall be a Dissimilar Substitution and shall be handled in accordance with Clauses 7.6 to 7.8 below, unless otherwise agreed by a majority of the Lines.

<u>Dissimilar Substitution triggered by one Line</u>

7.6    In accordance with discussions exercised by the Lines in reference to Clause 13.2, the Lines will also advise their provisional plans for Substituting

**"THE Alliance" Operating Agreement**

Containerships so as to introduce new tonnage, provide for growth and otherwise balance their share of the Lines' overall tonnage requirements.

7.7 Notwithstanding the requirement to advise provisional plans for a Dissimilar Substitution, all plans to introduce or withdraw Containerships shall be advised as soon as known to the other Lines with a minimum period of notice of introduction or withdrawal of six (6) months. Within one month of having received a six (6) months notice for Dissimilar Substitution, the Lines shall agree on the date for the deployment change.

7.8 Ten weeks prior to the introduction of a Substituting Containership a Line must also:

(a) Advise the anticipated full description of the Substituting Containership (including name), to be updated before introduction as information becomes available;

(b) Following agreement with the other Lines, commit to the date of substitution and phase-in port of the Loop on which it is to be employed;

(c) Suggest a plan for schedule coverage to maintain sailing schedule integrity including transhipment arrangements if required

Rights to introduce Substituting Containerships

7.9 All Lines have the right to introduce a New Containership in substitution of a committed Containership.

In the case of a Dissimilar Substitution with a New Containership, the Lines' rights are subject to:

(a) If the Line is an under-provider for a period of at least six (6) months, then that Line may introduce a Containership so long as

(i) the Line's under-provision is at least 7500 Slots in that period (or as otherwise agreed), and

(ii) the substitution should reduce the overall provision imbalance, and

(iii) the Containership being introduced is suitable for employment in the Service;

(b) If an under-providing Line does not meet these conditions or the Line is otherwise balanced or an over-provider, then that Line cannot reduce its under-provision or increase its over-provision as a result of the introduction of a Substituting Containership larger than the Substituted Containership without the agreement of the other Lines, such agreement not to be unreasonably withheld.

In such a Dissimilar Substitution the onus is on the Lines to decide on any changes to the deployment of the remaining fleet, the deployment of the

**"THE Alliance" Operating Agreement**

Substituting Containership and which Containership should be withdrawn from Service. Unless particular circumstances warrant the Containership to be withdrawn should be one provided by an over-provider at his nomination.

Rights to withdraw Containerships

7.10   All Lines have the right to withdraw a committed Containership subject to:

(a)   If the Line is an over-provider for a period of at least six (6) months, then the Line may withdraw a Containership so long as

(i)   the Line's over-provision is at least 7500 Slots in that period (or as otherwise agreed); and

(ii)   the substitution should reduce the overall provision imbalance.

(b)   If an over-providing Line does not meet these conditions or the Line is otherwise balanced or is an under-provider, then that Line cannot increase its under-provision or reduce its over-provision as a result of the withdrawal of a Substituted Containership larger than the Substituting Containership without the agreement of the other Lines, such agreement not to be unreasonably withheld.

In such a Dissimilar Substitution the onus is on the under-provider to introduce a Substituting Containership and for the Lines to decide on any changes to the deployment that may be necessary as a result of the changes in the fleet.

7.11   Clause 7.9 and 7.10 above shall be inapplicable to HMM during the initial three (3) years period of the Agreement as outlined in the vision statement term (g).

Place and Dates of Acceptance and Re-delivery

7.12   The port and date of acceptance of a Substituting Containership shall be a Turnport of the Loop on which the Substituting Containership is to be employed, unless otherwise agreed.

7.13   In the event that a Substituting Containership is available at the port of acceptance at a time other than the agreed date of acceptance then:

(a)   Unless required by the Lines the Substituting Containership will not be accepted for entry prior to the agreed time even if available;

(b)   Any delay in introduction will be treated in accordance with the Non-Performance rules set out in Clause 10.

7.14   If the Substituting Containership is required at a port other than a Turnport of the Loop on which it is to be employed, then the date of acceptance and the application of the rules in Clause 7.13 (a) and (b) for early availability or delay

## "THE Alliance" Operating Agreement

shall be determined by reference to the date on which it had been agreed that the Substituting Containership would be available in the Turnport of the Loop.

7.15    A Substituted Containership shall be re-delivered to the Ship Operator at the port at which it completes its discharge of cargo on the last Voyage in the Service. Subject to the provisions in Clauses 7.1717 to 7.21 below, the Substituted Containership shall cease to count for provision purposes at the time of re-delivery.

7.16    On withdrawal of a Containership from the Service, the Ship Operator shall ensure that the Voyage is completed and that all cargo being carried for the Lines is discharged at the intended port of discharge. If otherwise agreed that the Containership may leave Service at another port, then the Ship Operator shall be responsible for any costs and other consequences arising from the re-delivery of the Containership at that other port.

Costs

7.17    The Line introducing a Substituting Containership shall be responsible for any costs incurred in delivering the Substituting Containership to the Turnport of the Loop on which the Substituting Containership will be employed and any lay-by costs awaiting entry into Service, unless otherwise agreed.

7.18    Where the Lines agree to position a Substituting Containership to another port prior to entry into the Service, then any additional costs incurred over and above the costs determined in Clause 7.17 shall be for all Lines' account.

7.19    All other costs arising from the substitution, including the costs of Cascading other Containerships between Loops, shall be for all Lines' account. Such costs may include, inter alia, costs of positioning Containerships and lay-by costs.

7.20    The costs arising from clauses 7.1717 to 7.19 above, which are for all Lines' account, shall be shared in proportion to the Loop Allocation Shares applied for the affected Loop(s) of the Substituted Containership's last deployment.

7.21    For the purpose of this Clause 7, any costs associated with the Cascading of Containerships between Loops and/or Trades shall not be covered under the provisions of this Clause 7, but are specified in more detail in Clause 11.

Introduction or withdrawal of Trades or Loops

7.22    If the Lines agree to the introduction or withdrawal of Trades or Loops, then the changes in provision will be handled in accordance with the Phasing-in/Phasing-out Rules set out in Clause 11.

Introduction of additional Containerships/withdrawal of Containerships

7.23    Where Lines agree to introduce additional Containerships on a Loop or to reduce the number of Containerships on a Loop, then the dates on which the

**"THE Alliance" Operating Agreement**

Containerships shall be deemed to be provided (or cease to be provided) and the bearing of associated costs of introduction or withdrawal shall be in accordance with the relevant sub-clauses of this Clause 7.

**8.      Containership Scheduling**

8.1     Each Line shall remain responsible for the Containerships operated by it under this Agreement, including, but not limited to, covering periods of programmed maintenance and repair of its Containerships, which will necessitate withdrawal from Service.

8.2     In drawing up the long term schedule the Lines will, so far as possible, co-ordinate plans for such periods out of Service so as to avoid unnecessary disruptions to the sailing schedule. These plans may include requesting Lines to adjust their dry-docking programmes, switching Containerships between Loops, joint chartering of Containerships to cover gaps and adjustments to Containerships' speed and ports of call to close gaps or allow Containerships to be re-phased into the schedule. In any event the Lines shall give at least 90 days notice of programmed maintenance and repair.

8.3     On first notification of programmed maintenance and repair of a Containership, the Ship Operator shall provide an indication of

         (a)     the month in which the Containership will be required to be withdrawn from Service;

         (b)     the duration of the period the Containership will be out of Service.

         In addition the Ship Operator will commit to the continent or port range at which the programmed maintenance or repair will take place.

8.4     The plan for the withdrawal of the Containership will continue to be reviewed in the light of the operation of the Service and the Ship Operator's updated advice in respect of place and dates for the Containership's withdrawal from and re-entry into Service. No later than ten weeks prior to the planned date for withdrawal the Ship Operator and the other Lines shall commit to the agreed plan although further adjustments to the plan may be agreed subject to majority agreement of the Lines.

         The phase-out and subsequent phase-in should be made at a Turnport for the Loop on which the Containership is employed. However, the Lines may agree (by majority voting) alternative phase-out and subsequent phase-in ports in an endeavour to find a balance the requirements of the Service with the Ship Operator's requirements for minimum positioning time and costs to and from the maintenance or repair facility.

8.5     A Containership which is out of Service whilst undergoing programmed maintenance and repair will be regarded as being Off-Hire for the purposes of the financial settlement between the time and date of withdrawal and the time and date the Containership is again available for Service at the agreed phase-in

"THE Alliance" Operating Agreement

port. However, when a Line chooses to conduct maintenance and repair – whether scheduled or unscheduled - during an agreed void sailing period, the Lines shall continue to share the cost of the Containership throughout the duration of the void period, except for the period when the Containership is conducting maintenance and repair.

8.6    Where a Ship Operator:

(a)    Fails to give proper notice of a required period out of Service for a programmed maintenance and repair, or

(b)    Having given proper notice, fails to re-deliver the Containership at the agreed phase-in date and time set out in the agreed plan,

then, in addition to the Containership being deemed to be Off-Hire whilst out of Service in accordance with Clause 8.5 and until such time as it can be phased back into the schedule, the Non-Performance procedures and consequences set out in Clause 10 will apply.

8.7    If a Ship Operator makes the Containership available for re-entry into Service earlier than the agreed plan, then the Containership will remain Off-Hire and any consequential costs such as lay-by shall be for the account of the Ship Operator until the agreed date and time of re-entry. If the Lines agree on a majority basis to an earlier re-entry of the Containership for the benefit of the Service as a whole, then the Containership will be On-Hire from such agreed earlier date and time.

8.8    The costs of maintenance and repair of Containerships shall be for the account of the Ship Operator. In addition the Ship Operator shall be liable for the costs of moving a Containership from the Phase-out Port to the maintenance and repair facility and for returning the Containership to the Phase-in Port unless otherwise agreed.

8.9    The decision to void sailings shall be subject to majority vote of the Lines if four (4) weeks lead time is given. Within four (4) weeks void sailing shall be agreed unanimously. In the event of a Line carrying out a Containership void voyage during slack periods, it is agreed that any financial compensation scheme shall be limited to the amounts stipulated in Clause 16 in this Agreement.


**9.    Performance of Containerships**

9.1    In respect of each Voyage leg a Ship Operator shall be deemed to have performed the Service required under this Agreement if:

(a)    Schedule reliability

The Containership arrives at each port of call according to the latest agreed sailing schedule, within the allowed time limit of date and time indicated on the sailing schedule and completed its discharge programme, and

(b)    Slot Provision

## "THE Alliance" Operating Agreement

All other Lines have received their full allocation of Slots and/or deadweight and/or supplementary allocations of reefer plugs and 45' Slots on the Containership in respect of that Voyage leg.

9.2     The Lines agree that Containership schedule integrity is of the utmost importance and will make every endeavour to maintain schedule on each leg. The Lines agree to maintain no less than ninety percent (90 %) on time arrival at first port of call (on time arrival meaning within 24 hours of the berth guarantee window for the first port of call) based on agreed proforma schedules in the respective Trades covered under this Agreement in Clause 3. Measurement of on time performance shall be defined within the Joint Working Procedure:

In the event of a failure to meet on time performance as defined in the Joint Working Procedure, the EXECOM shall review the existing sailing schedule and discuss and agree on improvement plans in order to improve the performance.

9.3     The Lines may also agree that the Containership should "cut and run" from any port in order to maintain schedule. Notwithstanding the general principle in Clause 15 below, the total Container exchanges possible in any such restricted port time will be shared between the Lines in proportion to their Loop Allocation Shares, unless the historical throughput statistics as defined in the Joint Working Procedure at that particular port on the relevant Loop deviates materially from such Loop Allocation Shares.

9.4     An operational sailing schedule for each Loop shall be circulated on a monthly basis, based on the long term schedule pattern and covering at least 6 months, updating arrival and departure dates to take account of the current position of the Containerships and any agreed operational adjustment to future Voyages.

9.5     As the date on which a Voyage is due to commence approaches, the Lines shall review whether the relevant Containership will be available and on time. If the Containership is not available, is late or is likely to fail to provide the Operational Capacities at all scheduled loading ports, then the Lines shall decide on the course of action as set out in Clause 10 below.

9.6     The Lines may not omit ports where there is one primary user without the consent of the Line that is the primary user unless by maintaining the call, a further delay of more than 24 hours will be anticipated. The ports subject to this Clause are listed in the Joint Working Procedure.

9.7     The voting and decision making of the Lines shall be applied as laid out in Clauses 25.2 and 25.3 of this Agreement.

## 10.     Non-Performance of Containerships

Operational planning for Non-Performance

**"THE Alliance" Operating Agreement**

| | |
|---|---|
| 10.1 | If a Ship Operator becomes aware of any kind of disruption to the Service resulting in schedule delay and/or loss of provision of Slots ('Non-Performance'), he shall inform the other Lines immediately.

The Ship Operator shall initially provide a proposed remedial action to address the Non-Performance on a best endeavours basis no later than 48 hours after the incident causing the disruption.

Agreement to the proposed remedial action shall not be unreasonably withheld, but if any of the other Lines do not agree, then that Line shall provide a full alternative proposal within a further 24 hours. No later than 72 hours after the incident causing the disruption the Ship Operator shall finalise the remedial action ("Remedial Action").

For the avoidance of doubt, Non-Performance as identified in Clauses 10.4 to 10.10 are not considered as routine operational matters and therefore a majority vote which includes the Ship Operator is required for all proposed Remedial Actions.

<u>Remedial Action</u> |
| 10.2 | Any proposed remedial action to remedy the Non-Performance described in Clause 10.1 shall take account of the expected length of the disruption to the Service, particularly whether the Containership (for the purposes of this Clause referred to as the "Affected Containership") will be delayed by more than 7 days and therefore be overtaken by the next Containership sailing in the relevant Loop thereby causing a missing Voyage.

Notwithstanding the general provisions relating to the general or financial responsibility arising from the disruption, all Lines shall endeavour to assist in providing a quick and satisfactory remedy to the disruption to the schedule and in ensuring that cargo is not lost nor subject to undue delay.

In the event that the Affected Containership is expected to be delayed by less than 7 days, the proposed remedial action shall include plans to put the Containership back on schedule as soon as practicable by taking corrective measures including speeding up and/or by omission of port(s).

In the event that the delay is expected to be greater than 7 days as a result of the Ship Operator not having consulted with the other Lines for remedial actions, then the proposed remedial action shall include plans for the Ship Operator to replace the Slots lost by the failure to maintain position within the schedule such as by either providing a Replacement Containership or transhipment arrangements to/from an alternative port of discharge/loading or by giving up some of the Ship Operator's own allocation on parallel or subsequent Voyages. The proposed remedial action shall also include plans of how the Affected Containership may be re-introduced into the schedule with minimum disruption to other sailings.

<u>General and financial responsibilities for Non-Performance</u> |

**"THE Alliance" Operating Agreement**

10.3    The responsibility for carrying out the agreed Remedial Action and the financial consequences thereof are set out in the following Clauses and, save only in the specific circumstances set out in Clauses 10.12 and 10.13 below, must be identified as and divided into one of two mutually exclusive cases of Non-Performance as follows:

(A)   Default case (see Clauses 10.4 to 10.10 below), or
(B)   Breach of Contract (see Clause 10.11 below)

(A) DEFAULT CASE

A-1 Default Criteria

10.4    If the Affected Containership should be out of Service or otherwise fails to comply with the performance criteria set out in Clause 9 of this Agreement due to any of the following events (which are not as a result of circumstances described in Clause 10.11 but where, nevertheless, the Ship Operator shall be deemed to be in default) then, without prejudice to the general obligation to provide and operate the agreed number of Containerships in the Service, the responsibility of the Ship Operator (also referred to as the "Defaulting Line" for the purpose of this Clause) shall be limited to the remedies provided in Clauses 10.5 through 10.10 below:

(a)    Breakdown of the Containership's machinery, defect in the Containership (including mechanical inability of the Containership to maintain the agreed schedule), accident to its hull or machinery (including accidents to its hull or machinery causing damage to cargo), collision, stranding, deficiency or defect of officers, crew, bunkers or stores, failure or refusal or inability of officers or crew for whatever reason to perform the Service immediately required in each case whether or not in the control of the Line, its servants or agents; or

(b)    Accident to cargo (including accident to cargo causing damage to the Containership's hull or machinery) while on board if due to the negligence of the Defaulting Line, its servants or agents;          or

(c)    Negligence of the Defaulting Line, its servants or agents in the operating, navigation, or management of the Containership or in the care of the Containership's Goods; or

(d)    Industrial action instigated only by reason of the nationality or flag of the Containership or by the nationality of the officers or crew.

(e)    Actual or constructive total loss of the Containership or requisition by the state in which the Defaulting Line providing the Containership is incorporated, or the state in which the Containership is registered; or

(f)    In respect of unprogrammed maintenance or repair of a Containership, or, in accordance with Clause 8.6 of this Agreement, the failure to give required notice of programmed maintenance or repair thereof or failure to

### "THE Alliance" Operating Agreement

re-deliver the Containership on time from programmed maintenance or repair in accordance with Clause 8.6 of this Agreement; or

(g)   Arrest of the Containership; or

(h)   Responsibility for Stowaways and Contraband or drugs, subject always to Clause 10.12 (a) and (b); or

(i)   Containership detained by acts of piracy.

A-2 Delays of less than 7 days

10.5   If, at the time of assessing the proposal to remedy the Non-Performance, the expected delay is less than 7 days, then:

(a)   The Ship Operator is always responsible for taking appropriate measures to regain the schedule, such as by speeding up or by omitting subsequent ports.

(b)   In accordance with Clause 12.2(a) of this Agreement in the case of port omissions as a result of the incident, transhipment of imports will be the responsibility of the Defaulting Line. Transhipment costs for export cargo from the omitted port will be for account of the individual Container Operators.

A-3 Delays of 7 days or more

10.6   If, at the time of assessing the recovery plan the expected delay is 7 days or more, then

(a)   In accordance with Clause 10.1 above, the Lines will agree Remedial Action which in the case of the Defaulting Line under Clause 10.4 shall include plans for the Defaulting Line to replace the Slots lost by either providing a Replacement Containership as first priority, in order to maintain the schedule position and Slot provision.

(b)   If no Replacement Containership or Slots can be made available, the Lines will agree to a Remedial Action that may involve using Containerships of other Loops of the joint Service, whereby the Defaulting Line shall provide Slots by giving up some of its own allocations on parallel or subsequent Voyages and/or chartering Slots from third parties. Such Slots to be allocated to the other Lines in proportion to their Loop Allocation Shares.

(c)   The Defaulting Line shall, in case of port omissions being agreed in the Remedial Action, be responsible for the delivery of cargo onboard the Affected Containership to the intended port of discharge in a timely manner, including where necessary any transhipment and on-carriage. The responsibility for arranging transhipment and for bearing costs shall be in accordance with Clause 12.2 (a) of this Agreement.

**"THE Alliance" Operating Agreement**

(d)    Where Remedial Action involves using Containerships of other Loops of the joint Service, the Defaulting Line will also be responsible for the transhipment costs of import cargoes to omitted ports both onboard the Affected Containership and the other affected Containerships, if so agreed in the Remedial Action. The responsibility for arranging transhipment and for bearing costs shall be in accordance with Clause 12.2 (a) of this Agreement.

(e)    Where the Defaulting Line has not been able to make sufficient alternative Slots available pursuant to Clauses 10.6 (a) – (c), the Slot deficiency as a result of this Non-Performance shall be adjusted and compensated in the monthly settlement.

(f)    The responsibilities of and consequences for the Defaulting Line set out in Clauses 10.6 (a) to (e) above shall continue on following Voyages until such time as the effects of the disruption have been remedied. For the avoidance of doubt, the cost of implementing such Remedial Action shall be for the Defaulting Line's account.

<u>Other consequences of default case.</u>

10.7    Allocation Share adjustment after one (1) round voyage

In the event that the Affected Containership is out of Service for a period greater than one round Voyage and the Defaulting Line has not been able to provide Slots equivalent to the Operational Capacity of the Affected Containership, then the Lines will discuss whether an adjustment should be made to the entitlement of the Defaulting Line for Slots on all Containerships sailing within the Loop.

10.8    Replacement tonnage

10.8.1    If the Defaulting Line provides a Replacement Containership, then the provisions of Clause 7.2 of this Agreement relating to Similar Substitution shall apply, except:

(a)    The period of notice shall be waived;

(b)    If the Replacement Containership does not match the characteristics of the Containership being replaced but is nevertheless accepted, the EXECOM shall decide the extent to which the schedule should be amended to accommodate the ability of the Replacement Containership to meet the Service requirements. The performance of the Replacement Containership for the purposes of this Clause 10 shall be measured against any such amended agreed schedule.

10.8.2    As soon as practicable the Defaulting Line shall advise the time and place at which the original Containership will become available for re-introduction into the Service. The Lines shall take all reasonable measures to re-employ the original Containership and, if applicable, to redeliver any Replacement Containership as soon as possible in order to minimise costs, but the priority

"THE Alliance" Operating Agreement

shall be to maintain schedule integrity. The following principles shall guide the Defaulting Line and the EXECOM in such circumstances:

(a)   Where a Replacement Containership has been employed, then the Defaulting Line shall normally charter for redelivery at the last port of discharge on a Voyage leg.

(b)   The Defaulting Line shall be responsible for the costs of positioning the original Containership to take the next available Voyage slot or, if applicable the next Voyage leg after a Replacement Containership is phased out of the Service. Sufficient time overlap should be provided to ensure that the original Containership can load whilst cargo is discharged from alternative tonnage (including any Replacement Containership) without disruption to the schedule. The Defaulting Line shall also be responsible for any costs of re-delivery of any Replacement Containership from the port at which she is withdrawn from Service.

(c)   If, on the request of the Defaulting Line, it is unanimously agreed by the Lines that a Replacement Containership is withdrawn from the Service at other than the last port of discharge on a particular Voyage leg, then the Defaulting Line shall be responsible for the costs of transhipment of any Containers which were destined for the omitted discharge ports.

(d)   If the EXECOM decides that, notwithstanding (a) to (c) above, an alternative plan for the overall benefit of the Lines should be adopted whereby the original Containership does not re-enter Service in direct exchange (meaning simultaneous re-entry of original Containership with the withdrawal of alternative tonnage), either in respect of port of call or by time/date or both, with any alternative tonnage arrangements (including any Replacement Containership), then both the original Containership and the alternative tonnage (including any Replacement Containership) shall be regarded as provided to the Service until such time as the alternative tonnage arrangements are concluded or the Replacement Containership is re-delivered. The Lines shall determine the temporary Operational Capacity of such alternative tonnage arrangements or of any Replacement Containership for financial settlement purposes.

Any costs of positioning, re-delivery or transhipment in excess of those which the Defaulting Line would have borne under (a) to (c) above will be shared by all Lines in  proportion to their Loop Allocation Shares for the relevant Loop. Any lay-by cost of the Affected Containership prior to the re-introduction of the Affected Containership to the Service, shall not be shared and shall be for the account of the Defaulting Line.

Provision and operation costs

10.9   Notwithstanding 10.8.2 (d) above, in normal circumstances the original Containership remains the only Containership contributing towards the overall provision of the Defaulting Line. In principle allowances for operational costs

**"THE Alliance" Operating Agreement**

will not be paid on both the original and alternative tonnage arrangements (including any Replacement Containership) at the same time. However, when the original Containership is accepted back into Service, in order to commence loading on her long term schedule dates whilst the alternative tonnage arrangements (including any Replacement Containership) has still to complete the discharge programme, then allowances for both the alternative tonnage arrangements and the original Containership may be paid during the overlap period.

<u>Shortfall in Capacity</u>

10.10   To the extent not provided in preceding Clauses, if on any Voyage leg the Containership whilst in Service suffers a shortfall in capacity, then the defaulting Line shall, without prejudice to the Defaulting Line's general obligation to provide and operate the agreed number of Containerships in the Service, release such capacity from its own allocation as is required to ensure that the other Line(s) do not suffer a reduction in their respective allocations of Slots and deadweight on that Containership. Such Slots are to be allocated to the other Lines in proportion to their Loop Allocation Shares.

If the Defaulting Line is unable to release sufficient Slots and/or deadweight to satisfy the other Lines' allocations, then such shortfall shall be treated in accordance with the provisions of Clause 10.6(e).

If the situation is not remedied by the commencement of the next voyage leg, the Defaulting Line has the option to invoke Clause 10.6(e) in respect of any shortfall in capacity or continue to release Slots and deadweight.

Where an Affected Containership suffers a shortfall in capacity of reefer plugs or 45' Slots, then the Defaulting Line shall release its own allocation to the maximum extent available, but otherwise there shall be no financial compensation. Where however the shortfall in capacity extends beyond the end of the current Voyage, then the allocations shall be revised in accordance with the reduced provision made available by that Line.

(B) BREACH OF CONTRACT

10.11   In the event of Non Performance of a Containership due to intentional decision made or approved by a senior manager of the Ship Operator which the Ship Operator knew or should have known would result in Non Performance, other than for circumstances in Clause 10.4 above, then the Ship Operator shall be in default and shall take immediate steps to remedy the situation at its own expense. The Ship Operator as the Defaulting Line shall be liable for all costs and expenses incurred by the other Line as a direct result of a default under this Clause 10.11. For the purpose of this Clause 10.11 Non Performance of a Containership is limited to loss of provision of Slots in Clause 9.1 (b).

**"THE Alliance" Operating Agreement**

VARIATION ON MAIN CASE WHEN THE DEFAULTING LINE IS A CONTAINER OPERATOR

10.12   Notwithstanding Clauses 10.4 to 10.11 above, if the Affected Containership should be out of Service or otherwise fails to comply with the performance criteria set out in Clause 9 of this Agreement due to any of the following events then, without prejudice to the general obligation to provide and operate the agreed number of Containerships in the Service, the liability of the defaulting Container Operator shall be limited and the financial responsibilities of the defaulting Container Operator are set out in Clauses 10.13. The circumstances when this Clause may be invoked and the identification of the defaulting Container Operator are set out hereunder.

   (a)   Stowaways

         In the event that a stowaway is discovered on board a Containership, then the Ship Operator shall be deemed to be the Defaulting Line unless it can be proved that the means by which the stowaway gained access to the Containership was by hiding in the Charterers' goods and/or Containers prior to loading, in which case the Defaulting Line shall be deemed to be the relevant Container Operator.

   (b)   Contraband or drugs

         In the event that contraband or unmanifested drugs are discovered on board a Containership (not in a Container), then the Ship Operator shall be deemed to be the Defaulting Line. If contraband or unmanifested drugs are discovered in a Container, then the Container Operator loading that Container on board the Containership shall be deemed to be the Defaulting Line unless it can be established that the presence of contraband and/or unmanifested drugs or goods was due solely to the act, neglect or default of the Ship Operator or their servants, agents or sub-contractors, in which case the Defaulting Line shall be deemed to be the Ship Operator

   (c)   Failure to transmit manifest in accordance with any legislation under which this Agreement operates, or where a Container subject to a "hold" notice was nevertheless loaded on a Containership. The Defaulting Line is deemed to be the relevant Container Operator or Principal Carrier.

   (d)   Cargo or Container related problems

         In circumstances where a Containership is delayed as a result of problems arising from the carriage of specific cargo and/or Containers, then the Defaulting Line is deemed to be that Line being the Principal Carrier of the relevant cargo or the Container Operator of the Container causing the delay to the Containership.

## "THE Alliance" Operating Agreement

10.13   In those circumstances where a defaulting Container Operator can be identified, then that defaulting Container Operator shall pay an amount equal to that paid by the Defaulting Line in either Clause 10.5 or 10.6. to the Ship Operator and/or the other Lines respectively. For the avoidance of doubt Clauses 10.4 to 10.11 do not apply if the circumstances of the Non-Performance are as listed in Clause 10.12 above and the defaulting Container Operator also happens to be the Ship Operator.

10.14   Where the sacrifices, losses and expenses of a General Average incident involve settlements properly dealt with under the arrangements for General Average (i.e. in accordance with Clause 22 of this Agreement or Clause 19 of the Cross Slot-Charterparty (Appendix 5 of this Agreement) then those sacrifices, losses and expenses shall be dealt with under those arrangements and not under this Clause 10.

10.15   Where Non-Performance of a Containership is due to a Relevant Force Majeure Event as defined by Clause 29, and such circumstance is not enumerated in Clause 10.4, the Lines shall share the cost of the Remedial Action based on their Loop Allocation Share(s).

**11.     Phasing-in/Phasing-out rules**

Phasing-in

11.1    At the commencement of the Service, or on the introduction of a Line, Trade or Loop there will be a Phase-in Period which shall commence on the date on which the first Containership sailing under these arrangements, or such amended arrangements, is accepted for the Service and terminates on the date on which the last Containership required to complete the arrangements, or such amended arrangements, is accepted.

11.2    The Lines will jointly discuss and agree on a Phase-in Schedule and Containership line-up with the aim of providing the most economical and efficient method of introducing the Containerships into their Loops. The Phase-in Schedule for the commencement of the Service under this Agreement shall in principle be agreed no later than three (3) months prior to the commencement of the Service, the introduction of a line, Trade or Loop.

11.3    The port at which the Containership is planned to enter the Service under the agreed Phase-in Schedule shall be referred to as the Phase-in Port for that Containership.

**"THE Alliance" Operating Agreement**

| | |
|---|---|
| 11.4 | Once the Phase-in Schedule and Containership line-up is agreed the Containerships shall be considered to be committed to the Service as from their agreed Phase-in dates and times. |
| | Failure to provide the Containership at the Phase-in Port by the agreed Phase-in date and time shall be considered a default by the relevant Ship Operator and the Non-Performance Clause 10 shall apply. |
| 11.5 | At the commencement of the Service, while the Phase-in Ports shall be established in accordance with the Service requirements, Containerships shall be considered as being provided from the time that the Containership is available and accepted to commence operation for the Alliance at the agreed Phase-in Port at which the Alliance will commence a Loop. In case the Lines require utilizing a Containership from another port, the Containership will be treated as provided from the time the Containership is available at such other port and any additional costs to position the Containership to an alternative port required by the Lines, including any lay-by, shall be shared by the Lines. |
| 11.6 | During the Phase-in Period each Line will receive its full allocation of Slots, deadweight and supplementary capacity components on all Containerships sailing in the Service irrespective of the provision of Containerships to the Service at the date of sailing. The Loop Allocation Shares during the Phase-in Period will be calculated in accordance with the principles set out in Clause 13 based on the expected disposition of Containerships at the date of termination of the Phase-in Period. Any over/under provision of Operational Capacity during the Phase-in Period will be settled in accordance with Clause 16 and The Financial Manual. |
| 11.7 | If a Containership commences loading cargo under this Agreement prior to completion of discharging cargo carried under previous arrangements outside of THE Alliance Services then the Containership shall be deemed to be provided to the Service from the time of commencement of loading operations at the Phase-in Port as long as there is sufficient Slots available for loadings under the new arrangements, |
| 11.8 | If a Containership completes discharge of cargo under the old arrangements outside of THE Alliance Services, prior to commencing loading for this Agreement then: |
| | (a)    If a Containership does not commence loading concurrent with discharging operations of the old arrangements in which the Containership was employed, then the Containership will be considered as being provided to the Alliance in accordance with Clause 11.5 hereof, |
| | (b)    Any lay-by periods prior to the agreed Phase-in date shall be the responsibility of the Ship Operator. Any lay-by period after the agreed Phase-in date shall be shared between the Lines, |
| | (c)    If the Containership has to position to the Phase-in Port from the port at which discharge of cargo carried under the old arrangements was |

**"THE Alliance" Operating Agreement**

completed, then positioning and lay-by costs incurred between the completion of operations under the old arrangements and the acceptance of the Containership under this Agreement at the arrival pilot station at the Phase-in Port shall be the responsibility of the Ship Operator,

(d)    Where it is agreed to change the Phase-in Port after agreement of the Phase-in schedule, or where the Lines otherwise mutually agree any adjustment which involves additional costs to the Ship Operator, but which is beneficial to the Service as a whole, then the additional costs shall be shared between the Lines. The time from which the Containership shall be deemed to be provided to the Service shall be the earlier of:

    (i)    the time at which the Containership would have arrived at the pilot station at the original Phase-in Port, or

    (ii)    the actual time of arrival at the pilot station at the actual Phase-in Port at which the Containership enters the Service.

<u>Phasing-out</u>

11.9    On termination of this Agreement, the withdrawal of a Line or the withdrawal of a Loop there will be a Phase-out Period which shall commence on the date on which the first Containership sailing under these arrangements, or such amended arrangements, is released from the Service and ends on the date on which the last Containership to leave the arrangements, or such amended arrangements, is released.

11.10    The Lines will jointly discuss and agree on a Phase-out Schedule and Containership line-up which shall provide the most economical and efficient schedule for the Service for the remaining Voyages under the arrangements, or amended arrangements, but shall, so far as is practicable, take account of the future employment requirements of the individual Containerships.

11.11    The port at which the Containership is planned to leave the Service under the agreed Phase-out Schedule shall be referred to as the Phase-out Port for that Containership.

11.12    During the Phase-out Period each Line will receive its full allocation of Slots, deadweight and supplementary capacity components on all Containerships sailing in the Service irrespective of the provision of Containerships to the Service at the date of sailing. The Loop Allocation Shares during the Phase-out Period will be calculated in accordance with the principles set out in Clause 13 based on the expected disposition of Containerships at the date of commencement of the Phase-out Period. Any over/under provision of Operational Capacity during the Phase-out Period will be settled in accordance with Clause 16 and The Financial Manual.

11.13    If a Containership discharges cargo under this Agreement after the commencement of loading cargo operations for the Containership's future

"THE Alliance" Operating Agreement

employment out of THE Alliance Services then the Containership shall be deemed to be provided to the Service up to the time of the completion of discharge cargo operations at the Phase-out Port,

11.14 If a Containership completes discharge of cargo under these arrangements prior to commencing loading for future employment out of THE Alliance Services then:

(a) The Containership shall be deemed to be provided to the Service up to the time discharge cargo operations have been completed at the Phase-out Port,

(b) Any lay-by periods prior to the agreed Phase-out date shall be shared between the Lines. Any lay-by period after the agreed Phase-out date shall be the responsibility of the Ship Operator,

(c) If the Containership has to position from the Phase-out Port to the port at which cargo carried under future employment commences loading, then positioning and lay-by costs incurred between the time of dropping the outward pilot at the Phase-out Port under these arrangements and the commencement of loading under its future employment shall be the responsibility of the Ship Operator,

(d) Where it is agreed to change the Phase-out Port after agreement of the Phase-out Schedule or where the Lines otherwise mutually agree any adjustment which involves additional costs to the Ship Operator, but which is beneficial to the Service as a whole, then the additional costs shall be shared between the Lines. The time from which the Containership shall no longer be deemed to be provided to the Service shall be the later of:

(i) the time at which the Containership would have dropped the outward pilot at the original Phase-out Port, or

(ii) the actual time of dropping the outward pilot at the Phase-out Port.

11.15 As a result of an agreed Cascade within the scope of this Agreement for reasons not attributable to Clause 10.2 and 10.4 to 10.10, all cost of Cascading shall be shared by the Lines. Also in compliance with clause 12.2 (c) hereunder.

## 12.    Transhipment responsibilities for incomplete voyages of Containerships

12.1 As a result of the omission of a port cargo may have to be transhipped at the actual port of discharge onto another containership for delivery to the intended port of discharge. The responsibilities for the transhipment operation and for bearing the costs of the operation will be as follows.

12.2 In the event that the omission of a port arises:

(a) As a result of the substitution of a Containership under Clause 7, or as a result of the Non-Performance of a Containership under Clause 10.4 to

**"THE Alliance" Operating Agreement**

10.10, or 10.12, or as a result of the Phasing-out of a Containership for unprogrammed maintenance and repair or where, in the case of programmed maintenance and repair, insufficient notice has been given in accordance with Clause 8, then the responsibility for making a proposal for the delivery of cargo on-board shall lie with the Ship Operator of the relevant Containership (for the purpose of this Clause referred to as the "Affected Line"). Agreement to any proposal which ensures that the cargo is lifted from the actual port of discharge no later than the next available Containership of the Loop or any other Service which either of the Lines operate, having Slots and offering the relevant connections, subject to a maximum delay at the actual port of discharge of 7 days, shall not be unreasonably withheld.

If the remedial action plan is acceptable to the Lines, then the costs will be for the Affected Line's account. Where, however, the operation is not carried out by the Affected Line for whatever reason, the Affected Line shall pay for the operation on the basis of actual costs.

(b)    As a result of reasons other than described in (a) above, including the Phasing-out of a Containership for programmed maintenance and repair, then each Container Operator shall be responsible for arranging and paying for transhipment and on-carriage of cargo for which he is the Principal Carrier.

(c)    As a result of an agreed Cascade within the scope of this Agreement for reasons not attributable to Clause 10.4 to 10.10 or 10.2, all cost of transhipment and on-carriage shall be for each Container Operator's account.


**13.    Allocation Shares**

13.1    Each Line's overall Allocation entitlement will be based on each individual Line's overall capacity provision, i.e. the basic principle will be "What you put in, you take out", provided, however, that the Lines recognize that perfect symmetry between capacity provision and entitlement may not always be possible during the Interim Period of the Agreement. The Lines will cooperatively negotiate a mechanism for capacity allocations on a per-Loop basis, which shall also take into account the sharing of possible saw tooth effects as a result of different Containership sizes being deployed in a Loop during the transition period into the contemplated Service structure as set out in this Agreement.

Loop Allocation Shares

13.2    The Loop Allocation Shares for each Loop and the Trade Shares for each Line are as set out in Appendix 3. Unless otherwise agreed, the respective Loop Allocation and Trade Shares shall apply for any capacity changes as per Clause 13.5 herein. No later than September of each year or at a timing agreed by the

**"THE Alliance" Operating Agreement**

Lines, the Lines will advise the analysis of demand by Loop of their Trade demand for the subsequent year. The Lines will advise Loop demands for the forthcoming calendar year at the same time as confirming their provisional Trade demands for that year.

13.3    The Lines will agree Loop Allocation Shares for each Loop, which may be subject to alterations at any time on mutual agreement.

13.4    If the Lines' demands (either in respect of a Trade or a Loop) increase in such a way that capacity is exceeded and further tonnage cannot be made available to cover the increase in demand, then all Lines shall be entitled to require that their Trade Allocation Share and/or their Loop Allocation Shares shall be protected and shall not be artificially reduced as a result of other Lines increasing their demand beyond the ability of the Service to accommodate the requirement.

13.5    If a Line requires a reduction of its allocation on any Loop and consequently intends to declare less demand for the following year, it shall advise other Lines of its intentions, including revised demand figures. The Lines should then discuss the overall supply/demand situation, and if necessary, seek agreement to adapt to those changed circumstances by either changing the product or adjusting the deployment of the affected Loop in an effort to match the overall supply with all Lines' collective demand.

13.6    In the event that no changes are agreed to the product or to the deployment of the affected Loop, the Line having expressed its intention to reduce its demand in accordance with Clause 13.5 above shall offer its unrequired Slots to the remaining Lines. In such case the allocations shall be re-calculated and shared by the other Lines in proportion to their respective Loop Allocation Shares, who wish to increase their allocation. In the event, there's no requirement from the other Lines to increase their allocation, then the existing allocation shall apply.

13.7    It is agreed that the Line's Allocation Share, including, but not limited to, deadweight and reefer plugs, will be respected and protected by the Ship Operator at all times and case so required on Ship Operators' account.

13.8    Unless otherwise agreed, the Lines Trade Allocation Share as per Appendix 3 shall be respected. Any changes to the Loop capacity shall initially be shared based on the respective Loop Allocation Share. If necessary, further adjustments will be required on Loops where capacities have changed, in order to maintain the Lines' respective Trade Shares as per Appendix 3. A detailed explanation is included under Appendix 3.

**14.    Slot Allocation on Containerships**

14.1    Slot and deadweight allocations for each Voyage on each Loop shall be calculated and the use of Slots and deadweight shall be monitored for each Voyage. The Lines shall account to each other for the use of Slots as required by

## "THE Alliance" Operating Agreement

this Agreement. The mechanism to monitor the provision and use of Slots is set out in the Joint Working Procedure.

14.2 The Slot and deadweight, 45', and reefer plugs allocations given to each Line shall be calculated by applying their Loop Allocation Share to the relevant Operational Capacities of the Containership and this shall determine the entitlement to the use of Slots by that Line on the relevant Voyage.

14.3 Slot releases shall be effected on a 10.5 tons per TEU basis, except for any operational restrictions caused by draft limitations, which shall be shared proportionally by all Lines. However, the reduction due to stress, stability, trim, etc. shall be borne by the respective SOL of the Containership. It is agreed that 40' High Cube Containers and 45' Containers shall be counted as having occupied two TEU.

14.4 Where the Containership on which Slots are provided is listed in Appendix 4, or any agreed amendment thereto, Slots shall be provided upon the terms of the Cross Slot-Charterparty attached as Appendix 5 hereto and the Lines agree to sign a charter in these terms with the appropriate Lines shown as Owners and Charterers respectively, incorporating such other detail as may be required and dated as per this Agreement if called upon to do so by any other Line. The term "Owners" as used in that Cross Slot-Charterparty shall mean the Ship Operator and the term "Charterers" used therein shall mean the Container Operator.

## 15. Use of Slots

15.1 Each Line shall be entitled to use its Slot allocation without any geographical restrictions regarding the origin or destination of the cargo subject to operational restrictions and efficiency targets as promulgated from time to time. There shall be no priorities for either full, empty, wayport/interport or breakbulk cargo subject to Clause 15.2 of this Agreement.

15.2 To promote efficiency in the utilisation of Slots onboard of Containerships, the following rules shall apply.

   (a) If on any sailing a Line is unable to utilise any Slot allocation, such allocation shall be made available to other demanding Lines in proportion to their Loop Allocation Shares relating to that Loop subject to prior consent of such Line with unused allocation. Slot allocation release requests should not be unreasonably withheld.

   (b) A Line utilising Slots in excess of its allocation, shall reimburse the Line(s) providing such Slots at rates stipulated in The Financial Manual. A reduced rate will apply to Slots which has been purchased for and used for the carriage of empty Containers.

   (c) A Line utilising Slots in excess of its allocation on a Coastal Passage shall be entitled to use such Slots at no additional cost but must immediately return the Slots to the relevant Container Operator(s) on demand at any

## "THE Alliance" Operating Agreement

subsequent port. Lines shall not abuse this right and operational restrictions may be introduced to ensure that the Containerships meet their pro-forma Voyage schedules.

Adjustment of unused/additionally required slots within THE Alliance.

15.3   Any Line requiring additional Slots from other Lines on any sailing shall advise its requirements to the Lines' Slot controllers. The Lines' Slot controllers shall, after consultation with the other Lines, respond to the request within 24 hours.

(a)   If there is more than one under-utilising Line which wishes to release Slots and only one Line requiring such Slots, the total Slots to be released on that sailing shall be shared by such under-utilising Lines in proportion to their respective Loop Allocation Shares.

(b)   If there is more than one Line requiring additional Slots from an under-utilising Line, all such Lines will be treated on an equal footing and will receive Slots from the under-utilising Line in proportion to their Loop Allocation Shares.

(c)   If there is more than one Line offering additional Slots and more than one Line requiring additional Slots , all such Lines will be treated on an equal footing, and

(i)     if the Slots being offered is less than required, it shall be shared by the Lines requiring additional Slots in proportion to their respective Loop Allocation Shares.

(ii)    if the Slots being offered are more than required, it shall be shared by the Lines releasing Slots in proportion to their respective Loop Allocation Shares.

Any Slots transferred under this Clause 15.3 shall be deemed to be a committed sale and a committed purchase by the respective Lines, unless otherwise agreed.

15.4   If following the departure of a Containership from its last port of loading it becomes clear from the Regional Departure Report (RDR) / Final Baplie from the last load port in one region that any Line has used Slots in excess of its allocation, then a settlement shall be made whereby that Line shall purchase Slots from under-utilising Lines. The total amount of Slots to be purchased shall be apportioned between under-utilising Lines in proportion to their Loop Allocation Shares and where available such Slots shall be sold. Where one or more under-utilising Lines do not have sufficient unused Slots to satisfy their proportion so calculated, then the process will be repeated with the further requirements being re-apportioned between those Lines still having Slots to sell.

Adjustment of unused/additionally required slots with Third Parties

15.5   Any unused Slots within a Line's entitlement may be sold or sub-chartered ad hoc to any vessel operating common carrier (V.O.C.C.) third party(ies), always provided that there is prior consultation with the other Lines, and that the other Lines will have a first right of refusal of such unused Slots. The Line with

"THE Alliance" Operating Agreement

unused Slots may sell Slots to third parties only on an ad hoc basis (within a week before the intended sailing) if the Lines have failed to exercise their "first refusal" option within 24 hours. An ad hoc sale shall be deemed to be a sale of Slots on a single Voyage or Voyages on separate Loops serving a Trade occurring within a one week period.

15.6   A Line requiring additional Slots on an ad hoc basis should first approach the other Lines to ascertain whether they have unused Slots to sell. If, however, other Lines are unable to fulfil a Line's Slot requirements then the Line requiring Slots may charter Slots, on an ad hoc basis, from a third party; or if there is insufficient time to consult with other Lines without losing other opportunities to ship cargo, then Slots may be acquired from third parties on an ad hoc basis without soliciting Slots from members. Ad hoc shall mean purchases for no more than 4 consecutive sailings on a given loop.

A Line having identified additional Slot requirement at annual review or otherwise: and subject to compliance with regulatory requirement, may approach the other Lines to ascertain whether they have unused Slots to sell on a more permanent basis, if the other Lines are unable to fulfil the Line's Slot requirement, then the Line may charter such additional Slot on a more permanent basis from third parties

15.7   Slot sales to (or Slot purchases from) third parties on an other than ad hoc basis must be discussed and unanimously agreed upon in advance by the Lines, except for those covered under Clause 15.6. Such agreement shall not be unreasonably withheld.

All Slot sales to any V.O.C.C. third party(ies), ad hoc or otherwise, shall include a requirement that the third party make no sub-charters without prior written consent from all the Lines, which shall not be unreasonably withheld.

15.8   In furtherance to the provisions of Clauses 15.5 to 15.7, the liability regime and other arrangements between the Lines in respect of obligations, responsibilities and liabilities between the Lines and between the Line(s) and third parties in respect of Slots bought, sold or exchanged are set out in more detail in Clauses 17 to 21.

Sharing Additional Operational Capacity

15.9   In the event that a Ship Operator is able to load more than the Operational Capacity of a particular Containership as a result of the conditions appertaining to an individual Voyage, then the Ship Operator shall make further Slots available to the other Lines in proportion to their Loop Allocation Shares.

The other Lines are not bound to take up any additional allocation, but if they do so, then they shall pay for any such additional Slots at the agreed ad hoc Slot rate. In the event that any Line wishes to load more than its Loop Allocation Share of the Operational Capacity of the Containership, then it shall purchase Slots from other Lines before making use of any Slots available above the Operational Capacity of the Containership. In the event the Ship Operator loads

**"THE Alliance" Operating Agreement**

in excess of its allocation due to its ability to load more than the Operational Capacity, in such case, no additional compensation will be necessary as long as the other Lines have fully utilised their allocations. Where one or more Lines have not fulfilled its allocation, then Clause 15.4 shall apply.

## 16.   Financial Arrangements

16.1   The Lines shall maintain a fair and equitable method of sharing the costs of providing and operating the Containerships deployed in the Services.

16.2   Monthly financial settlements will take place to settle the marginal over/under provision of Slots and Voyage costs by each Line in accordance with the agreed mechanism as set out in The Financial Manual. In addition monthly settlements will include other financial items referred to in The Financial Manual or as agreed to from time to time.

16.3   Settlement of any over/under provision of Slots between the Lines shall be at a Slot rate per day. Such Slot rates shall be established to reflect the Charter Hire level and other appropriate factors and shall be set in principle every November for the following calendar year.

16.4   The Containership cost component of the Slot rate for the initial three (3) years term will be US$ 3.50 per Slot per day.

## 17.   Liability (General)

17.1   The liability regime under this Agreement is intended to be a fair and reasonable allocation of responsibilities of each Line inter se and to third parties. The Lines' bilateral responsibilities in their roles as Ship Operator and Slot Charterer respectively shall be as set out in Appendix 5. Each Line agrees

   (i)    that it shall be primarily responsible as Principal Carrier for claims made by those interested in Goods carried under its Transport Document (as defined in Appendix 5) in the Service, and

   (ii)   that it shall be primarily responsible as Principal Carrier for any damage or loss caused by its Goods to other Lines and to any third party and to any Containership during the Service, and

   (iii)  the Ship Operator shall be primarily liable in respect of any third party claims made against its Containership for any loss or damage caused by the Containership during the Service

   provided that the Responsible Line shall be liable to indemnify the other Line(s) and/or the Ship Operator thereafter under the terms as set out below.

17.2   Nothing in this Agreement shall prejudice or deprive the Lines, the Ship Operator or the Slot Charterer of their respective rights of limitation or exclusion of liability under any applicable or relevant law and/or international convention.

## "THE Alliance" Operating Agreement

**18.     Containership lost or damaged**

18.1     Each Line agrees that

(a)     (i)     if the Ship Operator's Containership is lost or damaged when in the Service as a result of an actionable fault or default of another Line ("the Responsible Line") or

(ii)     if the Ship Operator is liable to a third party (which expression shall, where used in this Clause 18, exclude any Line) for loss or damage of whatsoever nature and howsoever arising in connection with the Service due to an actionable fault or default of the Responsible Line

then provided (a) in the case of a third party claim the Ship Operator complies with sub-clause 18.2 below and subject always to sub-clauses 18.4, 18.6 and 18.7 and (b) subject to any defences or provisions to the contrary available to the Responsible Line in this Agreement or in any Appendix to this Agreement; and subject to Clause 18.1(b) below, the Responsible Line shall be liable to and obliged to indemnify the Ship Operator to the full extent of the loss or damage to its Containership or in the case of a third party claim to the full extent of the Ship Operator's legal liability to the third party

(b)     The Responsible Line's liability to and obligation to indemnify the Ship Operator is always subject to application of either

(i) the Responsible Line's rights of recourse, if any, and the right of limitation or exclusion of liability under any applicable or relevant law and/or international convention in relation to the loss or damage to the Ship Operator's Containership or

(ii) the Ship Operator's rights of limitation or exclusion of liability under any applicable or relevant law and/or international convention.

18.2     For the avoidance of doubt the Ship Operator shall do all things reasonably necessary to defend a third party claim brought against it pursuant to sub-clause 18.1 above. It may compromise any such third party claim if reasonable so to do on the basis of legal advice and shall keep the Responsible Line fully and timely informed about the conduct of the third party claim and shall if reasonably possible seek the Responsible Line's prior approval to any settlement.

18.3     The Ship Operator and the Responsible Line may expressly agree on a case by case basis that the Responsible Line shall stand in the Ship Operator's shoes to defend a sub-clause 18.1 third party claim as if the Responsible Line were primarily responsible to the third party in place of the Ship Operator. The Ship Operator will do all things necessary to enable the Responsible Line so to proceed, including but not limited to all reasonable assistance as regards the provision of documents and evidence, whether written or oral, to enable the Responsible Line properly to defend and, if reasonable so to do on the basis of legal advice, to settle the third party claim on the Ship Operator's behalf.

"THE Alliance" Operating Agreement

18.4  Where the loss or damage to the Ship Operator's Containership is caused by stevedores or Terminal Operators in the performance of the Owner's Stevedoring Operations (as defined in sub-clause 14(ii) of Appendix 5) then such loss and damage shall be the sole responsibility of the Ship Operator who shall be deemed to be the Responsible Line for this purpose.

18.5  The Responsible Line's obligations under sub-clauses 18.1 and 18.3 (and in the case of the Ship Operator, under sub-clause 18.4) shall be strictly without prejudice to any right of recourse it may have against a third party (which expression for this purpose shall not include that other Line's insurers) in respect of such loss or damage.

18.6  If the loss or damage to the Ship Operator's Containership is caused by an actionable fault or default of stevedores or Terminal Operators in the performance of the Stevedoring Operations (as defined in sub-clause 14(i) of Appendix 5) at a scheduled port in the Service, then the Ship Operator's indemnity shall be limited to such amount as the Responsible Line or, at its option pursuant to sub-clause 18.7(ii) below the Ship Operator, recovers from the stevedores or Terminal Operators.

18.7  In the case of loss or damage caused by an actionable fault or default in the performance of the Stevedoring Operations pursuant to sub-clause 18.6 above then the Ship Operator at its sole discretion may require:

(i)  The Responsible Line promptly to pursue the recourse action and do all things necessary to obtain a reasonable recovery or to obtain a final Judgment or Award of a competent Court or Tribunal on behalf of the Ship Operator. The Responsible Line shall be obliged to fully and timely inform the Ship Operator about the conduct of the action and to obtain the approval of the Ship Operator to the steps to be undertaken (such approval not to be unreasonably withheld). The Ship Operator shall use its best endeavours to assist the Responsible Line including but not limited to the provision of relevant documentation and witness evidence, whether written or oral; or

(ii)  The Responsible Line to transfer its rights of recourse against the stevedores or the Terminal Operators to the Ship Operator within 30 days of a written request from the Ship Operator so to do and to do all things necessary including the assignment or other transfer of rights that the Ship Operator may require in relation to such recourse claim and to provide all reasonable assistance to the Ship Operator in the pursuit of the claim including but not limited to the provision of relevant documentation and witness evidence, whether written or oral.

18.8  If the Responsible Line in breach of sub-clause 18.7(ii) should not be willing to transfer to the Ship Operator all conduct of any enforcement of rights and to co-operate as required in assisting the Ship Operator or if the Responsible Line in breach of sub-clause 18.7(i) fails promptly to pursue the recourse claim itself or

**"THE Alliance" Operating Agreement**

misses any deadlines for so doing then the Responsible Line's liability shall revert to that set out at sub-clause 18.1 above.

### 19.    Goods lost damaged or delayed

19.1    If any claim is made under or pursuant to a Transport Document against the Principal Carrier for loss or delay or damage to Goods, the Principal Carrier shall settle such claim directly with the claimant in the first instance and any subsequent recovery by the Principal Carrier against the Responsible Line (which shall include the Ship Operator) shall be limited to the amount of the Principal Carrier's liability to the Transport Document claimant plus the Principal Carrier's reasonable legal costs and disbursements incurred in defending the Transport Document claim and also in obtaining a recovery from the Responsible Line.

19.2    If, notwithstanding sub-clause 19.1 a claim or allegation for loss of or delay or damage to Goods is made against any other Line, including the Ship Operator or against any of its servants, agents or sub-contractors (collectively "the Other Line"), then the Principal Carrier shall in the first instance at its option either (i) stand in the shoes of the Other Line when the Other Line's liabilities and rights shall be transferred to and vested in the Principal Carrier who shall take over and deal with that claim, when the Other Line shall do all things necessary to assist the Principal Carrier so to do including but not limited to the provision of relevant documents and evidence, written or oral, or (ii) require the Other Line to defend the claim and then bring a recourse action against the Principal Carrier in respect of any legal or other fees that the Other Line reasonably incurs for the proper defence of the claim including funds required to be paid under a reasonable settlement or to satisfy any final Judgment provided always the Principal Carrier has been fully and timely informed about the conduct of the claim and has approved the steps taken by the Other Line (such approval not to be unreasonably withheld). For the avoidance of doubt, this sub-clause 19.2 shall be without prejudice to the Principal Carrier's rights of recovery against the Responsible Line under sub-clause 19.1

19.3    Should the Other Line be in serious breach of its duties to cooperate with the Principal Carrier following the exercise of either of the Principal Carrier's options at sub-clause 19.2 above, the Other Line must then at its sole responsibility, cost and expense defend the third party claim as it may deem appropriate without recourse to the Principal Carrier or any other Line.

### 20.    Goods causing loss or damage

20.1    If any loss or damage is caused to Goods (for the purpose of this clause "Affected Goods") by other Goods (for the purpose of this clause "Offending Goods"), then the Responsible Line shall be the Line that issued or should have issued a Transport Document for the Offending Goods. The Responsible Line shall be liable to the other Line(s) and the other Line(s) shall be entitled to bring a

## "THE Alliance" Operating Agreement

recourse action against the Responsible Line for recovery, including for the other Line(s)' liability to those interested in the Affected Goods and shall be obliged to seek recourse on its own behalf from those interested in the Offending Goods. The other Line(s) shall do all things necessary to assist the Responsible Line in relation to its recovery action, including but not limited to the provision of relevant documentation and witness evidence, whether written or oral, and as necessary the assignment or other transfer of any rights that the Responsible Line might reasonably require in relation to such recourse claim.

20.2    Any recourse action against the Responsible Line by the other Line(s) for the other Line(s)' liability to those interested in the Affected Goods under sub-clause 20.1 above shall be limited to such amount as the other Line(s) has reasonably paid in settlement to or has been adjudged to pay to those interested in the Affected Goods together with the other Line(s) reasonable legal costs and disbursements in dealing with the claim.

20.3    Insofar as the Ship Operator as the Owner under Appendix 5 is primarily responsible to the Charterer for loss or damage to Charterer's Goods under Appendix 5 all as there defined, if Charterer's Goods are "Affected Goods" for the purposes of sub-clause 20.1 above then the recourse and indemnity provisions of this Agreement shall apply and take precedence over the primary responsibility of the Ship Operator as Owner under Appendix 5 save that the Ship Operator shall assist as necessary in obtaining an indemnity from the Responsible Line

**21.    Scope of Responsible Line's liability: catch-all provisions**

21.1    If any claim or allegation is made against any Line resulting in its being held jointly liable to any third party (which expression for this purpose shall not include the other Lines or any insurer of the Lines) with the other Lines, if thereafter  an arbitration panel appointed pursuant to Clause 40 and/or Clause 26 of Appendix 5 herein is unable by its Final Award to apportion liability between the Lines or in the circumstances of a particular case it is unreasonably burdensome to identify that Line or any other Line as the solely Responsible Line or apportion liability between the Lines, liability for such loss or damage shall be shared by those Lines that utilised Slots on the Containership the subject of the claim or allegation in proportion to their respective actual Slot allocation. If any Line held jointly liable to a third party had no Slots aboard the Containership the subject of the claim or allegation then it shall be indemnified by the other Line(s) in their respective actual proportions.

21.2    For the avoidance of doubt each Line agrees that:

(i)      It shall be responsible for the acts, defaults and omissions of any party (but always excluding another Line when sub-clause (ii) below shall apply) to whom it sub-lets Slots on any Containership in the Service and for any Transport Documents issued by such third party sub-contractor; and

(ii)     In any case where a Line sub-lets Slots in accordance with (i) above and as set out in sub-Clauses 15.5 and 15.7, that Line shall be deemed to be the

**"THE Alliance" Operating Agreement**

Principal Carrier for Goods occupying the Slot for all purposes under this Agreement.

(iii)    In the event that any Line transfers a Slot to another Line whether or not for value then the Line in receipt of the Slot shall be deemed to be the Principal Carrier for Goods occupying the Slot for all purposes under this Agreement.

21.3    In any case where all Lines collectively agree to sub-let Slots on any Containership in the Service to a third party (a "Subslot Charterer") the Line who release spaces to third party shall enter in to a Subslot Charter with the Subslot Charterer on terms materially the same as Appendix 5 hereto logically amended. The Ship Operator's responsibilities to the other Lines and of each Line inter se shall follow the liability regime under this Agreement (including for the avoidance of doubt sub-clause 21.1) strictly without prejudice to the rights of the Lines whether collectively or individually to pursue any recourse claim(s) against that Subslot Charterer.

## 22.    General Average

22.1    In no circumstances will a Line declare General Average or seek contribution towards a Salvage Award from other Lines or cargo interests where the total expenses, sacrifices and awards arising from any one incident do not exceed US$ 2,000,000. This restriction shall only apply to any Containership introduced by a Line to meet its obligation to provide tonnage, where it is the actual owner. Where the Line is merely the disponent owner of the Containership concerned, it shall make best endeavours to procure that the actual owner does not exercise any lien for contribution in General Average and/or Salvage by coming to whatever accommodation as may be necessary to dissuade the actual owner from so doing.

The restriction of US$ 2,000,000 mentioned above shall be subject to annual review.

22.2    Where General Average and/or Salvage expenses exceed US$ 2,000,000 Lines agree not to declare General Average and/or Salvage without firstly consulting with the other Lines to explore whether or not, taking account of all the relevant factors, such a declaration should be made

If it is decided not to declare General Average and/or Salvage, then notwithstanding that they exceed US$ 2,000,000, the expenses, sacrifices and awards concerned shall be funded as follows:

(a)    The Line (s) providing the Containership concerned shall fund the first US$ 2,000,000 as provided in Clause 22.1 above.

(b)    The excess over US$ 2,000,000 shall be funded among the Lines according to the following formula:

**"THE Alliance" Operating Agreement**

        (i)      Containers shall be valued according to the schedule of values currently applied by the Through Transport Club for such purposes.

        (ii)     Cargo shall be valued at a standard estimated value per TEU to be agreed  among the Lines on the basis of advice from the Average Adjuster handling the matter.

        (iii)    Containership valued at market value

        (iv)    Bunkers valued as per price at last bunkering

A truncated adjustment shall be prepared by the Average Adjuster appointed by the Ship Operator concerned applying the above bases of valuation to the actual carryings of each Line on the Containership concerned and all Lines shall contribute accordingly.

Decisions not to declare General Average and/or salvage above US$ 2,000,000 must be unanimous and, unless unanimity can be achieved, all Lines must declare General Average and /or salvage to their customers and obtain from them the necessary securities provided in Clause 19 of the Cross Slot-Charterparty attached hereto before release of the cargo to them.

22.3 If it is decided to declare General Average and/or Salvage the provisions of 22.1 and 22.2 above are inapplicable and the contribution shall be sought for all the expenses incurred and sacrifices made in accordance with York-Antwerp Rules 1994.

22.4 The Lines shall reasonably cooperate in respect to exchanging information, upon reasonable request of the Ship Operator and obtaining and securing Goods and Container-related security on a without prejudice basis.

## 23. Containers

23.1 The Lines shall only introduce into or use in the Service Containers, which are

    (a)    of a specification approved by ISO standards (including 45' Containers);

    (b)    physically compatible with the Containerships;

    (c)    properly maintained;

    (d)    in compliance with relevant port and other regulations (including quarantine regulations, Container Safety Convention);

    (e)    constructed of taint free materials;

    (f)    free from defect in construction.

23.2 The Ship Operator may refuse to carry any Container which does not comply with the requirements of Clause 23.1

**"THE Alliance" Operating Agreement**

23.3 In the interests of economy and efficiency Lines will liaise on Container requirements and, wherever possible, assist each other by Lines with surplus Containers at any location hiring the same to other Line with a local shortage.

## 24. Breakbulk, Oversized and Dangerous Cargo

24.1 The Lines may carry breakbulk, non-containerizable or dangerous cargoes moving in the Trades to the extent such cargoes may be reasonably and safely transported on the Containerships, always subject to stowage and with prior approval of the Ship Operator, which shall not be unreasonably withheld.

24.2 Details for such shipments are further specified in the Joint Working Procedure.

## 25. Administration

25.1 The Lines have established an organisation structure which efficiently operates and manages the Services in accordance with the terms of this Agreement. Day to day operational management of Loops, regardless of Loop categories, will be overseen by this organization structure.

25.2 Voting under this Agreement shall be based on one vote per Line.

25.3 Actions taken on major issues, which shall mean those concerning the Scope of the Service cooperation, the commencement or termination of Loops, the introduction of new Containerships in existing Loops, the Loop Allocation Shares of each Line, the financial arrangements with respect to Slot exchanges, the addition of a new party, or on any amendment of this Agreement, shall be reached by unanimous agreement of all Lines.

25.4 On all other matters, i.e. on routine operational matters unless otherwise provided herein or otherwise agreed by the Lines, a simple majority decision shall prevail. A simple majority vote shall require more than 50 percent (50%) of outstanding votes (for a four Line agreement, a majority vote shall require three votes), provided that in the case of a split decision on routine operational matters, the majority is determined by two votes which have a majority of 60% of the outstanding Loop Allocation Share, which will become the deciding factor.

25.5 In case of berth clashes, RCC members shall resolve the matter, where the basic guiding rule will be that the most economical solution for the group should be chosen.

## 26. Terminal Selection

26.1 Subject to the criteria hereunder, the Lines shall work towards the use of one ocean terminal at each port of call to the extent reasonably possible.

**"THE Alliance" Operating Agreement**

26.2    For compliance with environmental requirements such as AMP (Alternative Maritime Power) the compatibility of the Containership and terminal shall be fully considered.

26.3    The selection of ocean terminals shall be based on the following criteria for Containership and landside terminal operations:

  (i)    Highest gross productivity in comparison with directly competing terminals in terms of shore operation, yard operation including inland rail on-dock operation.

  (ii)   Competitive rates within the region with direct competing terminals.

  (iii)  Berthing guarantee as per each Service/Loops commercial requirement.

  (iv)   Most favoured user treatment within the region with directly competing ports.

  Each Line shall respect the other Lines' affiliated terminal(s) or equity investments to this extent, provided always that the above criteria are to be applied in the terminal selection process. This will apply to not only within specific ports but to terminals located within the same vicinity.

26.4    In line with aforementioned criteria and where legally permissible, the Lines will conduct joint terminal negotiations.

26.5    In those ports where the Lines have conflicting pre-existing terminal service contracts and/or labour agreements, THE Alliance will permit Containership calls at more than one facility as a last resort, provided, however, the Lines shall seek to rationalize terminal arrangements to the extent reasonably possible.

**27.    Additional Members**

27.1    The Lines explicitly do not rule out the option of admitting additional liner company members to THE Alliance, provided, however, any new membership will require unanimous agreement of the existing Lines.

27.2    Prior to this Agreement taking effect, the Lines have entered into several vessel sharing arrangements with third parties in the Trade. In conformance with Clause 3.6 above, it is agreed that all such arrangements will be honoured and continued unchanged as per the underlying contractual obligations, but preferably not extended any further.

27.3    As a basic principle, the right of first refusal amongst the Lines is to prevail prior to entering into any new long term third party arrangements.

**28.    Non-Assignment**

**"THE Alliance" Operating Agreement**

Consistent with the Lines' right under Clause 2.2 and 2.3, the rights and obligations of each Line under this Agreement herein shall not be assignable except to subsidiaries, parent companies or fellow subsidiaries or with the prior unanimous written agreement of all Lines. Each Line shall warrant that any subsidiary or fellow subsidiary to which any assignment is made shall not be sold to another party.

## 29.    Force Majeure

29.1    In such circumstances as the Act of God, the event of war, whether declared or not, hostilities or the imminence thereof, act of public enemies, arrest or restraint of princes, rulers or people, or compliance with any compulsorily applicable law or governmental directive, search and rescue operations, boycott against flag, political ban, terrorism, civil commotion, labour disputes, strikes, lock-outs or other events of a similar nature (the "Relevant FM Event") which render this Agreement, the Service, Loop or Voyage, as the case may be, partially or wholly impracticable,; this Agreement, the Service, Loop or Voyage, as the case may be, shall not thereby be terminated, but (subject always to the provisions of Clause 2 hereof) the performance of this Agreement, the Service, Loop or Voyage, as the case maybe shall be suspended (in whole or in part as appropriate) until such time as the performance thereof is again practicable, without prejudice to any rights, liabilities and obligations accrued at the date of suspension. Should the Relevant FM Event wholly suspend this Agreement, the Service, Loop or Voyage, as the case may be, for a period exceeding six (6) calendar months running continuously from the date of commencement of such Relevant FM Event, this Agreement, the Service, Loop or Voyage, as the case maybe, shall be terminated.

The party suffering a Force Majeure Event shall use commercially reasonable efforts to mitigate against the effects of such Force Majeure Event and re-commence performance whenever and to whatever extent reasonably possible without undue delay, e.g. through the use of alternate sources or workaround plans.

29.2    In the event that a Line considers that any cause, happening or event not within its control substantially impairs its ability to enjoy its rights or carry out its, or other Lines', obligations under this Agreement then, at its request, the Lines shall meet together with all reasonable dispatch in order to consider such adjustment of the terms hereof as may be mutually acceptable.

## 30.    Confidentiality

Except as required by law or any regulatory or government authority, including by order of a court or other authority of competent jurisdiction this Agreement shall be treated as confidential by the Lines and no Line shall divulge details of the contents hereof to any third party without the prior written approval of the

**"THE Alliance" Operating Agreement**

other Lines, provided, however, that the individual Line(s) may disclose the terms of the Operating Agreement to appropriate governmental authorities should there be necessary for such disclosure.

**31.    Compliance with Applicable Laws**

31.1    The Lines agree that they shall, individually and collectively, conduct all of their operations in compliance with applicable international, national and local laws and regulations, including, but not limited to, applicable regulatory compliance and trade sanctions, anti-corruption and bribery, environmental, labour, competition and privacy laws.

31.2    Each Line warrants:

> (i)  it is not, and will not become during the duration of this Agreement, identified on the U.S. Treasury Department's list of Specially Designated Nationals and Blocked Persons (the SDN List) or similar lists maintained by the United Nations, the European Union, the United Kingdom or other countries and that neither any Containerships it provides nor any party owning and/or operating such Containerships shall be identified on this list and

> (ii) the carriage of Goods and Containers under its Transport Document will not expose the other Lines to any loss, liability or expense for breach of any applicable trade sanctions laws and regulations

31.3    Each line shall indemnify each other Line for any loss, liability or expense arising in connection with any breach of this Clause and/or any breach or alleged breach of applicable trade sanctions laws as a result of the carriage of Goods and Containers under its Transport Documents.

**32.    Language**

This Agreement and all notices, communications or other writing shall be in the English language and no Line shall have any obligation to translate such matter into any other language. The wording in the English language shall prevail.

**33.    Notices**

Any notice or other communication which one Line hereto may require to give or to make to the other Lines under this Agreement shall, unless otherwise specifically provided herein, be written in English and sent by email with copy by mail or courier, to the other Parties points of entry and addresses of the other Lines as set out in the Joint Working Procedure.

**34.    Severability**

**"THE Alliance" Operating Agreement**

If any provisions of any Clause in this Agreement, as presently stated or later amended or adopted, shall be held to be invalid, illegal or unenforceable in any jurisdiction in which this Agreement is operational, then this Agreement shall be invalid only to the extent of such invalidity, illegality or unenforceability and no further. All remaining provisions hereof shall remain binding and enforceable.

**35.     Disclaimer of Partnership**

This Agreement is not intended to create a partnership or joint liability or joint and several liability under any jurisdiction.

**36.     Headings**

Headings in this Agreement are used for reference only and shall not be taken into account for the legal interpretation of the respective Clauses.

**37.     Interpretation**

37.1    The Appendices to this Agreement shall be considered as an integral part of this Agreement. In case of conflict between the terms and conditions as laid down in the various Clauses of this Agreement and the Appendices attached thereto, the order of precedence shall be as follows:

1.    Appendix 5 (Cross Slot Charterparty) as may be subsequently amended;

2.    This Agreement as may be subsequently amended;

3.    The remaining Appendices hereto (excluding Appendix 5) as may be subsequently amended

37.2    This Agreement represents the full understanding between Lines in respect of the Alliance Service and supersedes all previous agreements between the Lines in respect of their co-operation. It is recognized that the HoA signed 19th of June, 2019  is the basis for this Agreement, however, in case of conflict, this Agreement shall prevail.

**38.     Joint Working Procedure**

The communication channels, systems and procedures as well as other general items dealing with the day-to-day work for operation pertaining to the Service and so far not being covered under this Agreement, shall be specified in a separate document titled "Joint Working Procedure".

**39.     Time Zones**

## "THE Alliance" Operating Agreement

Wherever under this Agreement it is necessary for the purposes of any calculation to decide on what basis a time or date shall be calculated, the basis adopted shall be Greenwich Mean Time (GMT).

### 40.     Law and Arbitration

40.1     The interpretation, construction, and enforcement of this Agreement, and all rights and obligations between the Parties under this Agreement, shall be governed by the laws of England, provided, however, that nothing herein shall relieve the Lines from the applicable requirements of the U.S. Shipping Act of 1984, as amended.

40.2     Without prejudice to a Lines' right to seek relief in accordance with this Agreement or applicable law, the Lines shall use reasonable efforts to negotiate in good faith and settle amicably any dispute
or difference that may arise out of or relate to this Agreement (a "Dispute"). If a Dispute cannot be settled through negotiations by appropriate representatives of the Lines involved, a Line may give to the other Line(s) a notice in writing of the Dispute and request the Dispute to be resolved between the senior management of the relevant Lines (a "Dispute Notice"). Within seven (7) days of the Dispute Notice being given the relevant Lines shall each refer the Dispute to a member of senior management nominated by the Line who shall meet in order to attempt to resolve the Dispute. If the Dispute is not settled by agreement in writing between the Lines within fourteen (14) days of the Dispute Notice being given, regardless of whether a meeting has taken place it shall be resolved in accordance with sub-clause 40.3 below.

40.3     Any Dispute arising out of or in connection with this Agreement which cannot be resolved amicably in accordance with Clause 40.2 shall be referred to arbitration in London (unless varied with the unanimous consent of the Lines involved) in accordance with the Arbitration Act of 1996 or any statutory modification or re-enactment thereof. The arbitration shall be conducted in accordance with the LMAA (London Maritime Arbitration Association) terms current at the time when the arbitration proceedings are commenced.

40.4     In the case of a Dispute involving only two Lines, the tribunal shall consist of three (3) arbitrators. In such instances, the Line referring the matter to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other Line, and requesting that such Line appoint an arbitrator within 14 days. After appointment of an arbitrator by the second Line, the two appointed arbitrators shall appoint a third. If the two arbitrators cannot agree on a third, the third shall be appointed by the President of the LMAA upon request of either Line. The arbitrators shall have no financial or personal interest whatsoever in or with any Line and shall not have acquired a detailed prior knowledge of the matter in dispute. If the other Line does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the Line referring a Dispute

# "THE Alliance" Operating Agreement

to arbitration may, without the requirement of any further prior notice to the other Line, appoint its arbitrator as sole arbitrator and shall advise the other Line accordingly. The award of a sole arbitrator shall be binding on both Lines as if he had been appointed by agreement.

40.5    Where there are only two Lines to the Dispute and where the amount in dispute does not exceed US$100,000, the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

40.6    If a Line wishes to refer a Dispute to arbitration where there are three (3) or more Lines involved in the Dispute, the referring Line shall request that the President of the LMAA for the time being appoint the three (3) arbitrator tribunal.

40.7    Without prejudice to the tribunals' power under the LMAA Terms to order concurrent hearings, where two or more arbitrations appear to raise common issues of fact or law, the tribunals may direct that the arbitrations shall be consolidated. Where such an order is made, the tribunals may give such directions as the interests of fairness, economy and expedition require, including:

(a) That any directions previously given shall be revoked;

(b) That the documents which have been disclosed by the Lines in one arbitration shall be made available in the other arbitration upon such conditions as the tribunals may determine;

(c) That the evidence which has been given in one arbitration shall be received and admitted in the other arbitration, subject to Lines being given a reasonable opportunity to comment upon it and subject to such other conditions as the tribunals may determine.

40.8    If an order for consolidation is made under Clause 40.7 and the membership of the tribunals is not identical, the consolidated arbitration shall, after the date of consolidation, be heard and determined by the tribunal first appointed.

40.9    The arbitrators' decision, including the written findings of fact and conclusions, shall be final and conclusive; judgment may be entered on the award and the award shall be enforceable in any court of competent jurisdiction.

## 41.    Fidelity Clause

Each Line is obligated to maintain and continue all commercial, operational and administrative duties to sustain and run their own business activities, in accordance with this Agreement. Any changes that may affect the basis of this Agreement shall be immediately notified by the Lines, and entitle the other Lines to review the Operating Agreement as such.

"THE Alliance" Operating Agreement

**42.      THE Alliance Coordination Centre (ACC)**

The Lines agree to establish a Coordination Centre in order to assist member lines in coordinating the operations of the THE Alliance Containerships deployed in aforementioned scope. The Coordination Centre shall be authorized to perform administrative works as well as coordinate operational matters such as but not limited to the following:

(a)    Monitoring of Containerships deployed in the THE Alliance network and terminal performance

(b)    Issuing, updating and coordinating schedules

(c)    Ensuring Service quality and schedule integrity

(d)    Supporting the Lines in their monthly financial settlement as deemed required

The Coordination Centre shall be based in Singapore.
The detailed objectives and responsibilities of the Coordination Centre shall be described within the Joint Working Procedure whereas the respective Lines' responsibilities concerning the establishment, operation, costs and liabilities associated with the THE Alliance Coordination Centre (ACC) are outlined in Appendix 9 of this Agreement.

43.    Addition of Yang Ming (Singapore) Pte. Ltd.

Notwithstanding the existing contracting parties in the HoA, the Lines hereby agree that Yang Ming (Singapore) Pte. Ltd. shall be as a party to THE Alliance agreements (including but not limited to HoA, this Agreement and the supplements or amendments thereof) acting together with Yang Ming Marine Transport Corporation and Yang Ming (UK) Ltd. as a single Line (referred to as "YML"). Yang Ming Marine Transport Corporation and Yang Ming (UK) Ltd. along with Yang Ming (Singapore) Pte Ltd. shall be jointly and severally liable as that Line.

## "THE Alliance" Operating Agreement

**In Witness Whereof** the Lines have caused this Agreement to be executed by their duly authorized officers or agents on the respective date specified below with effect from the 01 April 2020.

Signed for and on behalf of

**Hapag-Lloyd Aktiengesellschaft**


..................................................................... Date:  March 2020

Signed for and on behalf of

**Hyundai Merchant Marine Co., Ltd.**


..................................................................... Date:  March 2020

Signed for and on behalf of

**Ocean Network Express Pte. Ltd.**


..................................................................... Date:  March 2020


Signed for and on behalf of

**Yang Ming Marine Transport Corp. and Yang Ming (UK) Ltd. and Yang Ming (Singapore) Pte. Ltd (operating as one Line)**


..................................................................... Date:  March 2020