# EXHIBIT 7

## "THE Alliance" Operating Agreement

### Appendix 5

### Cross Slot Charterparty

dated

between

(1) ..............................................

(Disponent) Owner of the Ship
……………………………
being at the date of this charter classed
……………………………
and having a container carrying capacity of   ……………………………
which Owner undertakes to maintain throughout the term of this Charterparty

(hereinafter called "the Owner")

and

(2) ..............................................

(hereinafter called "the Charterer")

**1.   DEFINITIONS**

**"Carrier"** means the Line identified in the Transport Document as responsible for the carriage of the Charterer's Goods or Other Goods. In the case of the Charterer's Goods the Carrier shall be deemed to be the Charterer and no other party. In the case of Other Goods the Carrier shall be deemed to be the Line which utilises or sub-lets the slot and no other party.

**"Charterer"** shall have the meaning as defined above.

**"Charterer's Goods"** means the whole or any part of the cargo received from the Charterer and any container including an empty container whether or not the container is owned or hired by the Charterer and any cargo and/or container including an empty container occupying a slot used or sub-let by the Charterer for the Voyage.

**"Charterparty"** means this Slot Charterparty

**"Hague Rules"** means the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August, 1924.

## "THE Alliance" Operating Agreement

**"Hague-Visby Rules"** means the Protocol to amend The International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August, 1924. – Brussels, 23rd February, 1968.

**"Institute Warranty Limits"** means the maritime area within which a Vessel may operate with marine insurance cover.

**"Other Goods"** means the whole or any part of cargo received from any Line except the Charterer (but including the Owner) and any container including an empty container whether or not the container is owned or hired by that party and any cargo and/or container including an empty container occupying a slot utilised by or sub-let by that Line (in respect of which that Line shall be the Carrier as above defined and the Principal Carrier pursuant to sub-clause 21.2 of the Operating Agreement).

**"Owner"** shall have the meaning as defined above.

**"Ship"** means any ship sailing in any service operated by the Owner acting alone or in a group.

**"Sub-contractor"** includes direct and indirect sub-contractor and their respective servants and agents.

**"Third Party"** means any entity not being a party to this Cross Slot Charterparty.

**"Terminal Operator"** means any independent contractor providing receiving, loading discharging, storage and delivery services at the scheduled port.

**"Transport Document"** means a document issued by a Carrier that evidences Carrier's receipt of the Charterer's Goods or Other Goods and evidences or contains the contract of carriage. A Transport Document may be a bill of lading or a seaway bill or a booking note or any other document intended to have contractual effect as or as evidence of the contract of carriage.

**"Voyage"** means the sailing of the Ship between ports for which the slot has been chartered by the Charterer from the Owner pursuant to this Charterparty.

It is agreed

2. **SLOT ALLOCATION AND PERIOD**

The Owner lets and the Charterer hires for the carriage of goods and containers ...... slots (or more or less as may be agreed for each Voyage) on board the Ship from ................ and thereafter until terminated by separate agreement.

## "THE Alliance" Operating Agreement

**3. EMPLOYMENT**

3.1 The Ship shall be employed only in lawful trades within the Institute Warranty Limits ("IWL") for the carriage of lawful goods and carried between good and safe ports where the Ship can safely lie always afloat Notwithstanding the above, the Owner is permitted to operate its ship outside the IWL provided that the Owners shall have obtained war risk insurance cover for such operations and shall have paid any additional premiums required.

3.2 The cargo carried pursuant to this Charterparty shall comprise of properly packed and stowed goods in seaworthy containers of standard sizes and specifications, and empty containers of such sizes and specifications save that uncontainerised and out of gauge goods may be carried, but only with the prior consent of the Owner. If accepted such items shall be carried under the terms of this Charterparty but subject to such additional conditions as the Owner may require.

3.3 The Charterer's Goods which are of a dangerous, inflammable, explosive, radio-active, obnoxious or damaging nature shall not be shipped pursuant to this Charterparty unless:

(a) prior written notice of their nature has been given to the Owner by or on behalf of the Charterer (including but not limited to particulars of the characters of the goods, the flash point, if any, the type of packing of the Charterer's Goods and any other information which the Owner may reasonably require); and

(b) the Owner has consented after receipt of such notice to accept those goods for shipment; and

(c) all the relevant requirements and recommendations of the International Maritime Organisation and the law and regulations in force in the country of registration of the Ship, the port of shipment, the port of discharge, any area through which the Ship may pass, and any scheduled port of call have been complied with by the Charterer; and

(d) the Charterer's Goods shall have been packed, labelled and stowed within the containers and the containers have been labelled by the Charterer in accordance with such law, regulations, requirements or recommendations, and in any event, so as to avoid such Charterer's Goods causing damage, injury or material discomfort to the Ship, crew and Other Goods and to any other property or person.

Live animals shall not be shipped pursuant to this Charterparty except by special arrangement with the Owner and then on no liability terms for the Owner.

3.4 If the requirements of sub-clauses 3.1, 3.2 and 3.3 are not complied with by the Charterer, the Charterer shall be responsible to the Owner against all loss,

# "THE Alliance" Operating Agreement

damage or expense arising out of the Charterer's Goods being tendered for shipment or being handled or carried by the Owner pursuant to this Charterparty.

3.5   Further, if in breach of sub-clause 3.3 Charterer's Goods of an inflammable, explosive, radioactive, obnoxious, damaging, injurious or dangerous nature are shipped they may at any time before discharge be landed at any place or destroyed or rendered innocuous by the Owner without compensation.

3.6   Even if Charterer's Goods are shipped with Owner's knowledge and consent pursuant to sub-clause 3.3, should the same become a danger to the Ship, another Charterer's Goods or Other Goods, they may in like manner be landed at any place or destroyed or rendered innocuous by the Owner without liability except to general average if any.

**4.   REMUNERATION**

The Owner shall be remunerated in accordance with provisions from time to time to be separately agreed or in default of agreement shall receive such remuneration as shall be fair and reasonable.

**5.   OWNER'S EXPENSES**

The Owner shall pay all wages, insurance premiums, charges, dues, taxes, agencies, commissions, fees and all other expenses whatsoever incurred in connection with the operation of the Ship.

**6.   VOYAGE AND DESTINATION**

6.1   The itinerary of each Voyage shall be mutually agreed between the Owner and the Charterer or, in default of agreement, the Owner's decision shall prevail, in which event the Owner shall advise the Charterer of the details of the itinerary as soon as possible together with prompt notification of any updates thereto (provided however that the itinerary agreed or decided shall always be in accordance with the Operating Agreement).

6.2   The Owner shall be entitled to exercise the liberties to deviate provided in the said Hague-Visby Rules at any time without prior notice to the Charterer. However, if during the course of a voyage the Owner should deviate in circumstances which under the Hague-Visby Rules do not permit the Owner to deviate, the Owner shall be responsible for any liability thereby incurred, unless the Owner shall have obtained the prior consent of the Charterer to such deviation, in which case this indemnity shall not apply.

6.3   Subject as may be otherwise agreed, the Owner shall have the liberty to take the Ship out of service for maintenance and repairs. In arranging such periods the Owner will take account of the Charterer's requirements so far as is reasonably possible.

## "THE Alliance" Operating Agreement

6.4  Notwithstanding anything to the contrary in this Charterparty or in the Operating Agreement, if at any time the Charterer becomes an Affected Line (as defined in Clause 2.4 of the Operating Agreement), the Owner may at its sole discretion and without notice to the Charterer:

   (a)  Carry the Charterer's Goods to the intended port of discharge by an alternative route to that indicated in any Charterers' Transport Document or that which is usual for goods consigned to that port of discharge; and/or

   (b)  Suspend the carriage of the Charterer's Goods and store them afloat or ashore under the terms of this Charterparty and exercise reasonable endeavours to forward them to the intended port of discharge, but the Owner makes no representations as to the maximum period of suspension; and/or

   (c)  Abandon the carriage of the Charterer's Goods and place them at the Charterer's disposal at any place or port which the Owner may deem safe and convenient, whereupon all responsibility of the Owner howsoever arising in respect of such Charterer's Goods shall cease.

6.5  Any steps taken by the Owner pursuant to Clause 6.4 shall: (i) constitute due performance of the Owner's obligations under this Charterparty; and (ii) if the Charterer's Goods are abandoned, constitute complete and final delivery of the Charterer's Goods. The Owner shall nevertheless be entitled to any remuneration which it would have earned if the Charterer's Goods had been carried to the intended port of discharge without the exercise of any of the Owner's rights under Clause 6.4.

6.6  The Charterer shall indemnify the Owner for any costs, losses, liabilities, or claims arising out of or in connection with any steps taken pursuant to Clause 6.4.

**7.   OPENING CONTAINERS**

7.1  The Owner shall be entitled at any time (but under no obligation) to open any container or package and to inspect the contents at the Owner's expense and shall promptly notify the Charterer if they do so. Where possible the Charterer shall be advised in advance so that they can attend such opening of container or package.

7.2  Containers opened must be properly closed and sealed and records maintained which must be available to the Charterer. The Owner must advise the Charterer promptly in writing of the replacement seal number. The Owner shall bear the cost of closing and re-sealing, save if the inspection of the contents of the container shows a discrepancy with the Charterers' Transport Document, when the Charterer shall be responsible in the first instance for the closing and resealing costs without prejudice to the Charterers' right to claim

    reimbursement of the same plus any other costs and expenses from those interested in the Goods.

7.3    If opening of any Container is the result of a request by Customs or other authorities then the costs of such opening and resealing shall be for the Charterer in the first instance, without prejudice to the Charterer's right to claim reimbursement of the same plus any other costs and expenses from those interested in the Goods.

**8.    ACCESS TO LOGS**

8.1    The Master and Engineer shall keep full and correct logs and adequate records concerning the care and condition of the containers and the Charterer's Goods and all logs and records relevant to the Voyage, the containers, the Charterer's Goods and, if reasonably required, Other Goods shall be accessible to the Charterer who shall also be entitled to copy the same. If the Owner is not the registered owner of the Ship, the Owner shall ensure that such a similar provision is included in the Charterparty or contract between the Owner and the party from whom the Owner charters the Ship and shall use reasonable endeavours to assist the Charterer to obtain all such logs and records relevant to the defence of the case.

8.2    The Owner will co-operate with the Charterer to assist them to identify witnesses including but not limited to Ship's witnesses and obtain statements and other necessary evidence in respect of any incident during the currency of this Charterparty which gives rise to a claim against the Charterer.

**9.    LIABILITY REGIME - GENERAL**

    The liability regime under this Charterparty is intended to be a fair and reasonable allocation of responsibilities between the Owner and the Charterer. Subject always to the specific provisions as more fully set out below: the Charterer shall be responsible for and in the first instance shall deal with all claims made by those interested in the Charterer's Goods and with all claims caused by the Charterer's Goods, while the Owner shall be responsible for and in the first instance shall deal with all loss and damage caused by the Ship and/or by Other Goods carried under the Owner's Transport Document to the Charterer and/or to the Charterer's Goods and shall deal with any claims made by those interested in Other Goods (including those made under Owner's Transport Documents) not caused by the Charterer's Goods.

**10.    OWNER'S LIABILITIES & OBLIGATIONS**

10.1    The Owner will be responsible for the seaworthiness of the Ship in accordance with Article III Rule 1 and Article IV Rule 1 of the Hague-Visby Rules as scheduled to the Carriage of Goods by Sea Act 1971, and subject thereto shall be entitled to the rights and immunities set out in Article IV Rules 2, 4 and 6

## "THE Alliance" Operating Agreement

of the Hague-Visby Rules for all purposes in connection with this Charterparty.

10.2 Subject to sub-clause 10.1, the Owner will be responsible planning the stowage of the ship, for the proper and careful carriage, custody and care of the Charterer's Goods whilst on board the Ship and for unsecuring and discharging the Charterer's Goods at a port of refuge and for unsecuring, discharging, handling and storing the Charterer's Goods discharged solely in order to be reloaded or in order to load or discharge Other Goods and for re-loading, re-stowing and re-securing the same provided that any such temporary discharge of the Charterer's Goods is not undertaken at the specific request of the Charterer.

10.3 The Owner will be responsible for the Owner's Stevedoring Operations as defined in sub-clause 14 (ii). Should the Charterer's Goods be damaged, lost or delayed by, or should any personal injury or death result from, any of the Owner's Stevedoring Operations then the Owner shall be solely responsible therefor and shall indemnify and hold the Charterer harmless in respect of any claim, including any third party claim, made against the Charterer in respect thereof.

10.4 Subject to sub-clause 10.1, the Owner shall be responsible for the provision of:

(a) Adequate electrical power, and sufficient ventilation if under-deck stowage is provided

(b) A supply of refrigerant gas of the type and number specified by the manufacturer and in accordance with the Joint Working Procedure in place, and

(c) A supply of the recommended lubricating oil, bunkers and

(d) Plugging or unplugging, and

(e) Plugs and cables to integrated refrigerated containers and actively ventilated containers (collectively "Mechanical Containers") containing the Charterer's Goods shipped on the Ship.

10.5 The Owner shall use all reasonable endeavours to monitor and record the performance of all Mechanical Containers whilst on board the Ship and to the extent the Owner has the necessary resources (including spare parts etc.) on board in order to repair and rectify any breakdown, default or deficiency which may occur in any Mechanical Containers using the resources on board the Ship as set out in detail in the Joint Working Procedure. The Owner shall keep a reasonable number of spares on board the Ship to carry out repairs. If the spares on board the Ship are insufficient the Owner, in consultation with and at the expense of the Charterer, shall use all reasonable endeavours promptly to obtain any required spares or the assistance of a specialised refrigeration engineer to the extent as set out in detail in the Joint Working

## "THE Alliance" Operating Agreement

Procedure. The Owner shall be liable for any loss of or damage to Mechanical Containers or the Charterer's Goods therein arising out of any breakdown, fault or deficiency of its machinery but only for such proportion of the loss or damage as was caused directly by the failure of the Owner to comply with the terms of sub-clause 10.4 and/or this sub-clause.

10.6 The Owner shall indemnify the Charterer against any expense, liabilities, loss, damage, claims or demands which the Charterer may reasonably incur or suffer by reason of any failure by the Owner to comply with any notices of Customs, port and any other authorities, relevant laws, regulations, directions, sanctions, prohibitions and orders which relate to the Ship, its ownership, its flag, its crew and to any of the ports visited in the Service or by reason of any infestation, contamination or condemnation or damage or loss arising from any act, neglect or default of any party interested in any Other Goods carried on board the Ship under the Owner's Transport Document other than Charterer's Goods.

10.7 In the event of any loss or damage:

(i) caused to the Ship or to Other Goods other than by the Charterer's Goods then these shall, for the purposes of this Charterparty, be the primary responsibility of the Owner who shall be obliged to seek recourse in relation thereto on its own behalf; and;

(ii) caused to the Charterer's Goods carried on the Ship by Other Goods, carried under another Line's Transport Document, not being the Owner's Transport Document, then the Charterer shall be primarily responsible to seek recourse, on its own behalf from the responsible third party, including a Responsible Line if any as defined in the Operating Agreement; and

(iii) caused to the Charterer's Goods carried on the Ship by Other Goods carried under the Owner's Transport Document then the Owner shall be responsible to the Charterer and those interested in the Charterers' Goods in respect of all loss, damage and expense incurred by each of them

**11. CHARTERER'S LIABILITIES & OBLIGATIONS**

11.1 In relation to the Charterer's Transport Documents, the Charterer shall be primarily liable:

(i) as Carrier to those interested in the Charterer's Goods but subject always to the Charterer's rights of recourse as more particularly set out in Clause 13 and

(ii) to the Owner for any loss or damage caused to the Ship or to Other Goods by the Charterer's Goods as a result of an actionable fault or neglect of the Charterer or those interested in the Charterer's Goods.

"THE Alliance" Operating Agreement

11.2   Any Transport Document issued by the Charterer must expressly identify the Charterer as the Carrier and shall contain a Paramount Clause incorporating the Hague or Hague-Visby Rules for the sea transportation period, the New Jason Clause and the Both-to-Blame Collision Clause. The Transport Document must not incorporate the Hamburg Rules nor any terms more onerous than those applied by the Hague or Hague-Visby Rules, nor should it provide for shipper's higher value declarations but must acknowledge that the Carrier has no knowledge of the value of the cargo, and shall in no circumstances provide a liability per package or unit of weight in excess of that applied by the 1979 Brussels Protocol to Article IV Rule 5(a) and 5(d) of the Hague-Visby Rules as to Special Drawing Right units of account. Although the Charterer gives no warranty or undertaking as to the efficacy of such Clauses, the Transport Document shall also include a Himalaya Clause (which extends to the law and jurisdiction/arbitration clause in the Transport Document) and a Circular Indemnity Clause in favour of the Owner and any co-Charterer or Slot Charterer, their servants, agents and sub-contractors. The Charterer shall be obliged to issue a Transport Document which includes the above Clauses in respect of any Charterer's Goods occupying slots allocated to the Charterer and, as between the Owner and the Charterer, the Charterer's rights and liabilities in respect of the Charterer's Goods shall be determined as if the Charterer had issued such Transport Document.

11.3   The Charterer's Transport Document shall provide for General Average to be adjusted and settled at any port or place at the option of the Charterer as the Carrier on terms no less beneficial than the York-Antwerp Rules 1994 but always excluding the York-Antwerp Rules 2004 which shall not be incorporated. The Charterer's Transport Document shall provide that the Rules governing responsibility and provision for General Average shall apply to the Charterer's Goods whether loaded on deck or under deck.

11.4   Except as a result of a Himalaya Clause, the Charterer's Transport Document shall not create a contractual relationship between those interested in the Charterer's Goods with the Master and/or with the Owner.

11.5   The Charterer shall process all claims made under its Transport Documents and shall defend or compromise any such claim as it may reasonably decide, when it shall fully satisfy any settlement agreed by it or any judgment entered against it. The Charterer shall keep the Owner fully and timely informed about the conduct of the claim and shall if reasonably possible seek the Owner's approval to any settlement in the event that a recourse claim against the Owner is contemplated.

11.6   If notwithstanding 11.1 above any party interested in or purporting to be interested in the Charterer's Goods pursues a claim wholly or partly directly against the Owner or, in cases where the Owner is not the owner of the Ship, if the person from which the Owner has chartered the Ship seeks an indemnity in respect of a claim by a party interested in or purporting to be interested in the Charterer's goods, then the Charterer, without prejudice to their rights of

**"THE Alliance" Operating Agreement**

recourse under this Charterparty, will indemnify and hold the Owner harmless on the terms more particularly set out in this Clause 11.

11.6.1 Should notwithstanding sub-clause 11.5 those interested in the Charterer's Goods or, in cases where the Owner is not the owner of the Ship, the person from whom the Owner has chartered the Ship, threaten or commence proceedings in any competent jurisdiction against the Owner then, provided always the Owner provides prompt notice and full details of the same, the Charterer shall at its option either

(i) stand in the Owner's shoes when the Owner's liabilities and rights shall be transferred to and vest in the Charterer who shall take over and deal with the claim, when. the Owner will do all things reasonably necessary to assist the Charterer so to do, including but not limited to the provision of a Power of Attorney or other written authority, and all reasonable assistance as regards the provision of documents and evidence, whether written or oral, to enable the Charterer properly to defend the claim on the Owner's behalf or

(ii) require the Owner to defend the claim, and then bring a recourse action against the Charterer in respect of any legal or other fees that the Owner reasonably incurs for the proper defence of the claim, including funds required to be paid under a reasonable settlement or to satisfy any Final Judgment provided always the Charterer has been fully and timely informed about the conduct of the claim and has approved the steps taken by the Owner (such approval not to be unreasonably withheld)

11.6.2 If notwithstanding the Owner's full compliance with 11.6.1 above the Charterer is unable to stand in the Owner's shoes for reasons beyond the Owner's control or should the Owner and the Charterer expressly agree on a case by case basis that the Owner shall itself defend the claim, the Owner is entitled to bring a recourse claim against the Charterer in respect of any legal or other fees the Owner reasonably incurs for the proper defence of the claim including funds required to be paid under a reasonable settlement of the claim or to satisfy any final Judgment provided always that the Charterer has been fully and timely informed about the conduct of the proceedings and has approved the steps taken by the Owner (such approval not to be unreasonably withheld).

11.7 Should the Ship or Other Goods be damaged, lost or delayed by, or should any personal injury or death result from, any of the Stevedoring Operations as defined in sub-clause 14 (i) then the Charterer shall be solely responsible therefore and shall indemnify and hold the Owner harmless in respect of any claim, including any third party claim, made against the Owner in respect thereof.

11.8 The Charterer shall indemnify the Owner against any expense, liabilities, loss, damage, claims or demands which the Owner may reasonably incur or suffer by reason of any failure by the Charterer to comply with any notices of Customs, port and any other authorities, relevant laws, regulations, directions,

"THE Alliance" Operating Agreement

sanctions, prohibitions and orders which relate to the Charterer's obligations under this Charterparty, or by reason of any infestation, contamination or condemnation or damage or loss arising from any act, neglect or default of any party interested in the Charterer's Goods carried on board the Ship.

**12.  OWNER'S RECOURSE RIGHTS AND OBLIGATIONS**

12.1  If loss or damage is caused by reason of those matters set out in sub-clause 10.7 (i) above then this shall be the primary responsibility of the Owner who shall have no right of recourse against the Charterer in respect thereof under this Charterparty, but always without prejudice to any rights that the Owner may have as the Ship Operator against the Responsible Line under the Operating Agreement (including  Appendix 5 Cross Slot Charterparty).

12.2  If loss or damage is caused to the Charterer's Goods carried on the Ship by reason of those matters set out at sub-clause 10.7 (ii) then the Charterer shall on its own behalf seek recourse , from the Responsible Line as determined in accordance with Clause 20 of the Operating Agreement, but shall have no responsibility in respect of any damage to the Ship or to the Owner who alone shall be obliged to seek recourse  in respect thereof from the responsible third party, including a Responsible Line if any as defined in the Operating Agreement; or

12.3  If loss or damage is caused to Charterers' Goods carried on the Ship by reason of those matters set out at sub-clause 10.7(iii) then the Charterer shall have recourse action against the Owner.

**13.  CHARTERER'S RECOURSE RIGHTS AND OBLIGATIONS**

13.1  The Charterer's obligations at sub-clauses 11.5, 11.6 above and for the Stevedoring Operations at 14.(i) shall be its primary liability but shall always be strictly without prejudice to its right subsequently to obtain reimbursement or a contribution from the Owner of all sums properly paid and reasonably incurred by it whether on its own behalf or on behalf of the Owner in respect of the claim in the event that the liability that the Charterer has (or which it has assumed by virtue of its obligations to provide recourse to the Owner  under sub-clause 11.6.) arises in whole or in part from a breach or breaches of Owner's liabilities under Clause 10 above or otherwise under this Charterparty.

13.2  The Charterer's rights of recovery under sub-clause 13.1 above shall also include the Charterer's reasonable legal costs and disbursements and other expenses incurred in relation to its primary liability and also in obtaining a recovery from the Owner of any sums so paid.

13.3  The liability of the Owner to reimburse or make a contribution to the Charterer under sub-clause 13.1 above shall be back to back with and shall, save for the addition of those sums due to the Charterer pursuant to sub-clause 13.2 above, in no event exceed the primary liability (if any) of the Charterer for the claim

under the Charterer's Transport Document and shall be subject always to the Charterer's compliance with its obligations under sub-clauses 11.2 and 11.4.

13.4 The liability of the Owner for any loss of or damage to or in connection with a container owned or hired or operated by the Charterer shall not in any event exceed the cost of repair or the market value of the container at the time of such loss or damage, whichever is the less, and the Owner and the Ship shall not in any event be liable for any damage to a container which does not exceed US$500 on any one voyage.

13.5 In the event that the Charterer is liable to the Owner or to a third party in relation to the Stevedoring Operations in accordance with sub-clause 11.6 the Owner shall use its best endeavours to assist the Charterer in relation to any recovery action the Charterer may have against the stevedores or the Terminal Operator including but not limited to the provision of relevant documentation and witness evidence, whether written or oral, and as necessary the assignment or other transfer of any rights that the Owner may have for the benefit of the Charterer in relation to such recourse claim.

**14. RESPONSIBILITY FOR STEVEDORES**

The responsibilities of the Owner and the Charterer under this Charterparty for those functions of stevedores or a Terminal Operator as identified below shall be as follows:

(i) any loading, stowing, lashing, securing, unlashing, unsecuring and discharging operation undertaken by stevedores or the Terminal Operator at the loading and discharging ports identified in a Charterer's Transport Document shall be carried out as agents for and at the expense of and under the responsibility of the Charterer in respect of the Charterer's Goods ("the Stevedoring Operations").

(ii) in all other cases the Stevedoring Operations shall be carried out by stevedores or the Terminal Operator as agents for and at the expense of and under the responsibility of the Owner ("the Owner's Stevedoring Operations").

**15. ARREST**

15.1 In the event that the Ship or other ship in the ownership, associated ownership or control of the Owner is arrested or otherwise detained as security for a claim by a party said to be interested in the Charterer's Goods then the Owner shall provide its own security in such amount and on such terms as the Owner is able reasonably to negotiate or as the Owner is ordered by any Court or Tribunal of competent jurisdiction to provide, when the Charterer shall promptly provide counter-security either by way of a Club Letter or if that is not available by way of a bank guarantee or other security, in a form acceptable to the Owner on back-to-back terms in consideration of the Owner providing primary security.

"THE Alliance" Operating Agreement

15.2 In the event that the Ship is arrested or detained for security for any claim set out at sub-clause 10.7 above then the Owner shall promptly provide the same to procure the release of the Ship.

16. **TIME BAR**

16.1 The liabilities of the Owner under sub-clauses 10.1 – 10.7, 13.4 and 14(ii) shall be time barred absolutely 18 months after the Charterer's Goods have been or in the case of non-delivery when the Charterer's Goods should have been delivered or 30 months in the event of any claim which is brought under or subject to the Hamburg Rules. If the Charterer receives a claim for which it intends to seek recourse against the Owner, the 18 month period alternatively 30 month time bar periods as above shall still apply in the case of such recourse claim. Requests by the Charterer for extensions of time shall not be unreasonably refused.

16.2 The liabilities of the Charterer under Clauses 11 and 14(i) shall be time barred absolutely 18 months after the Charterer's Goods have been or in the case of non-delivery when the Charterer's Goods should have been delivered or 30 months in the event of any claim which is brought under or subject to the Hamburg Rules. If the Owner receives a claim for which it intends to seek recourse against the Charterer, the 18 month period alternatively 30 month time bar periods as above shall still apply in the case of such recourse claim. Requests by the Owner for extensions of time shall not be unreasonably refused.

17. **GENERAL RIGHT OF LIMITATION**

Nothing in this Charterparty shall prejudice or deprive the Owner or the Charterer of their respective rights of limitation or exclusion of liability under any applicable or relevant law and/or international convention.

18. **SANCTIONS**

The Owner and the Charterer will comply with trade sanctions laws and regulations applicable at any time during this Charterparty, including but not limited to applicable United Nations resolutions, European Union regulations, and US federal and state laws and regulations ("the Sanctions Laws").

The Owner and the Charterer will each maintain a process for complying with Sanctions Laws and will keep adequate records of this compliance process. The Charterer warrants that the carriage of Charterer's Goods including containers will not expose the Owner to any liability for breach of Sanctions Laws. The Charterer shall indemnify the Owner for any loss, liability or expense arising in connection with any breach or alleged breach of a Sanctions Law as a result of the carriage of Charterer's Goods including containers.

"THE Alliance" Operating Agreement

The Owner may refuse to load, or may discharge at any place and without any further liability whatsoever, any Charterer's Goods including containers if it has reasonable grounds to believe that carriage thereof will or may contravene any Sanctions Laws or is otherwise contrary to the Owner's sanctions compliance policy.

**19.    GENERAL AVERAGE & SALVAGE SERVICES RECEIVED**

19.1    General Average shall be adjusted at any port or place at the Owners option and shall be settled according to the York-Antwerp Rules 1994. The Owner's remuneration and the freight earned by the Charterer shall not contribute to General Average. The Owner authorises and empowers the Charterer to act as the agents of the Owner in the collection of General Average security. The Charterer will use its best endeavours to assist the Owner to obtain the contributions properly due to the Owner in respect of the Charterer's Goods for which the Charterer is Carrier under a Transport Document as set out in more detail in Clause 11 unless delivered to the consignee prior to notice being given by the Owner to the Charterer that General Average security is required.

Furthermore, the Charterer guarantees the contributions properly due to the Owner in respect of containers owned or hired by the Charterer.

19.2    In the event of the Ship needing to engage salvage services and, in order to secure the release of the Charterer's Goods and containers for oncarriage, the Owner is required to give any undertaking to salvors to assist in the collection of security and not to release the Charterer's Goods including containers until acceptable salvage security has been provided, the Charterer shall guarantee to the Owner that the requirements of such undertaking will be met in respect of containers owned, hired or operated by the Charterer and furthermore use its best endeavours to assist the Owner to obtain such undertaking in respect of the Charterer's Goods for which the Charterer is the Carrier, provided that these requirements are notified to the Charterer prior to the delivery of the Charterer's Goods including containers to the Charterer.

19.3    In the event of a General Average situation arising at a port of refuge the Owner and the Charterer shall consult on the desirability and practicability of on-carriage under a non-separation agreement. The costs of such on-carriage recoverable within General Average as substituting expenses are for the account of the General Average community.

19.4    The Owner undertakes that his demands for General Average security and counter security for salvage (where Clause 19.2 applies) shall be reasonable in the light of what is readily available at the destination port/place of delivery. If the Owner is unprepared to accept security offered he will accept and reimburse to the Charterer any storage costs which the Charterer, despite best endeavours, is unable to recover from his cargo interests.

**"THE Alliance" Operating Agreement**

**20.  SALVAGE**

The Charterer shall be entitled to the percentage, as agreed for the Voyage under Clause 2, of all salvage and assistance to other ships after deducting the Master's and crew's proportion and all legal and other expenses including a reasonable sum for the time lost in salvage and the cost of repairing damage incurred in the salvage to the extent not recoverable from hull insurers. The Charterer shall be bound by all measures taken by the Owner in order to secure payment of salvage and to fix its amount.

**21.  STOWAWAYS**

Any fines, costs and losses incurred in respect of stowaways shall be for the Owner's account unless it can be proved that the means by which the stowaway gained access to the Ship was by hiding in the Charterer's Goods including containers prior to loading, in which case all such fines, costs and losses shall be for the Charterer's account, except to the extent that such fines, costs and losses have arisen as a result of unlawful conduct by the Master, officers or crew.

**22.  CONTRABAND AND DRUGS**

In the event that contraband and or unmanifested drugs or goods are found to have been shipped as part of the Charterer's Goods including containers on board the Ship, any fines or imposts levied and legal and all other costs incurred, including but not limited to loss of time for the Ship shall be for the Charterer's account and the Charterer shall on demand provide reasonable security required to enable the Ship to sail. If it can be established that the presence of contraband and or unmanifested drugs or goods was due solely to the act neglect or default of the Owner their servants agents or sub-contractors such fines or imposts levied and all legal and other costs incurred shall be for the Owners account who shall, on demand, provide the security.

**23.  DECK CARRIAGE**

23.1  The Charterer's Goods in containers and the Charterer's empty containers may be carried on deck and shall contribute to General Average whether carried on or under deck.

23.2  The Charterer's Goods not in containers and the Charterer's Goods stowed on flat racks may be carried on deck only with the mutual agreement of the Charterer and Owner in writing. The Owner shall not be bound to give such approval but in the event that it is given any loss or damage that arises solely because the carriage is on deck (but not otherwise) shall be at the Charterer's risk, responsibility and expense as between the Owner and the Charterer.

"THE Alliance" Operating Agreement

**24. NON-ASSIGNMENT**

Neither party shall assign this Charterparty without the prior written consent of the other, such consent not to be unreasonably withheld. The Charterer shall not sub-let any slots or part thereof unless otherwise agreed.

**25. MUTUAL EXEMPTION CLAUSE (Force Majeure)**

25.1 Neither the Owner nor the Charterer shall be responsible for any loss or damage or delay or failure in performance under this Charterparty resulting from Act of God, the event of war, whether declared or not, hostilities or the imminence thereof, act of public enemies, arrest or restraint of princes, rulers or people, or compliance with any compulsorily applicable law or governmental directive, search and rescue operations boycott against flag, political ban, terrorism, civil commotion, labour disputes, strikes, lock-outs or other events of a Force Majeure nature.

25.2 Except as elsewhere provided neither the Owner nor the Charterer shall be responsible for any indirect or consequential loss, including but not limited to damage or decline in the market value of the Ship or the Charterer's Goods during delays, loss of profit or loss of business opportunities in respect of any claim that the one may have against the other.

**26. LAW AND ARBITRATION**

26.1 The interpretation, construction, and enforcement of this Agreement, and all rights and obligations between the Parties under this Agreement, shall be governed by the laws of England, provided, however, that nothing herein shall relieve the Parties from the applicable requirements of the U.S. Shipping Act of 1984, as amended.

26.2 Without prejudice to a Party's right to seek relief in the courts the Parties shall use reasonable efforts to negotiate in good faith and settle amicably any dispute or difference that may arise out of or relate to this Agreement (a "Dispute"). If a Dispute cannot be settled through negotiations by appropriate representatives of the Parties involved, a Party may give to the other Party(s) a notice in writing of the Dispute and request the Dispute to be resolved between the senior management of the relevant Parties (a "Dispute Notice"). Within seven (7) days of the Dispute Notice being given the relevant Parties shall each refer the Dispute to a member of senior management nominated by the Party who shall meet in order to attempt to resolve the Dispute. If the Dispute is not settled by agreement in writing between the Parties within fourteen (14) days of the Dispute Notice being given, regardless of whether a meeting has taken place it shall be resolved in accordance with sub-clause 26.3 below.

"THE Alliance" Operating Agreement
105

## "THE Alliance" Operating Agreement

26.3   Any Dispute arising out of or in connection with this Agreement which cannot be resolved amicably in accordance with Clause 26.2 shall be referred to arbitration in London (unless varied with the unanimous consent of the Parties involved) in accordance with the Arbitration Act of 1996 or any statutory modification or re-enactment thereof. The arbitration shall be conducted in accordance with the LMAA (London Maritime Arbitration Association) terms current at the time when the arbitration proceedings are commenced.

26.4    In the case of a Dispute involving only two Parties, the tribunal shall consist of three (3) arbitrators. In such instances, the Party referring the matter to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other Party, and requesting that such Party appoint an arbitrator within 14 days. After appointment of an arbitrator by the second Party, the two appointed arbitrators shall appoint a third. The arbitrators shall have no financial or personal interest whatsoever in or with any Party and shall not have acquired a detailed prior knowledge of the matter in dispute. If the other Party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the Party referring a Dispute to arbitration may, without the requirement of any further prior notice to the other Party, appoint its arbitrator as sole arbitrator and shall advise the other Party accordingly. The award of a sole arbitrator shall be binding on both Parties as if he had been appointed by agreement.

26.5   Where there are only two Parties to the Dispute and where the amount in dispute does not exceed US$100,000, the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

26.6   If a Party wishes to refer a Dispute to arbitration where there are three (3) or more Parties involved in the Dispute, the referring Party shall request that the President of the LMAA for the time being appoint the three (3) arbitrator tribunal.

26.7   Without prejudice to the tribunals' power under the LMAA Terms to order concurrent hearings, where two or more arbitrations appear to raise common issues of fact or law, the tribunals may direct that the arbitrations shall be consolidated. Where such an order is made, the tribunals may give such directions as the interests of fairness, economy and expedition require, including:

(a) That any directions previously given shall be revoked;

(b) That the documents which have been disclosed by the Parties in one arbitration shall be made available in the other arbitration upon such conditions as the tribunals may determine;

(c) That the evidence which has been given in one arbitration shall be received and admitted in the other arbitration, subject to Parties being given

**"THE Alliance" Operating Agreement**

a reasonable opportunity to comment upon it and subject to such other conditions as the tribunals may determine.

26.8   If an order for consolidation is made under Clause 26.7 and the membership of the tribunals is not identical, the consolidated arbitration shall, after the date of consolidation, be heard and determined by the tribunal first appointed.

26.9   The arbitrators' decision, including the written findings of fact and conclusions, shall be final and conclusive; judgment may be entered on the award and the award shall be enforceable in any court of competent jurisdiction.

26.10   Any interest awarded under this Clause shall be simple interest only.

Signed

For and on behalf of the Owner                  ..........................................

For and on behalf of the Charterer              ..........................................

Dated ....................