# EXHIBIT 9

Yutaka Tsurusaki
tsurusaki@YTFKLaw.com
Fukashi Kobayashi
kobayashi@YTFKLaw.com
Capt. Chu Maruyama,
Master Mariner
maruyama@YTFKLaw.com

TSURUSAKI & KOBAYASHI
(T&K Partners)

501, Kioi Royal Heights, 3-29 Kioicho,
Chiyoda-ku, Tokyo 102-0094, JAPAN
Tel: 81-3-3288-0502   Fax: 81-3-3288-0503

YOUR REF:                                                                       OUR REF:

On 11th December, 2020

To: Messrs. the Alliance Members of
    the Alliance Operating Agreement

### RE: The ONE APUS Collapse of the Containers in the Pacific Ocean

We are Japanese lawyers and are acting for Ocean Network Express Pte. Ltd. ("ONE") in this matter.

The English lawyers for ONE are MFB, London (Mr. Matthew Montgomery). As the Alliance Agreement is governed by English law it may therefore be appropriate for your clients' English lawyers to make an approach to MFB in the days ahead. For now we deal with your correspondence of course.

We are in contact with the Owners who have advised that the Vessel is currently in a hazardous condition and that safety is their priority. Many parties are requesting access and so the Owners are taking a very restrictive approach at the moment. Covid issues are also a complication for them.

At the moment Owners are refusing any additional parties to access the Vessel. ONE fully understands its obligations under the contract with you regarding access. We are hopeful that as the situation becomes clearer onboard, the Owners will allow your surveyors access but this is not in our control.

As to documents, your requests are noted and we will pass these on to the Owners. Again, ONE is aware of its obligations under the contract with your client and will act accordingly of course.

TSURUSAKI & KOBAYASHI
(T&K Partners)

We will keep you updated regarding container inspections ashore as the Owners should not be able to deny access at that stage.

Yours faithfully,

..........................
Yutaka Tsurusaki
Attorney-at-Law
Tsurusaki & Kobayashi
(T&K Partners)

| | |
|---|---|
| **From:** | Matthew Montgomery |
| **To:** | Alexander Bramwell |
| **Cc:** | Ian MacLean; MFB ONE APUS |
| **Subject:** | RE: ONE APUS [HD-UKLIVE.1073117.136] |
| **Date:** | Wednesday, December 16, 2020 6:55:38 AM |

**CAUTION EXTERNAL EMAIL:** This message originated outside the organisation. Do not click links or open attachments unless you recognise the sender and know the content is safe.

Dear Alex

Thanks for your email below and your instructions are noted.

As an opening comment, your clients' lawyers in Japan and the USA are also making approaches on these same issues so please can you liaise with them to co-ordinate matters on your side.  It does not make much sense for three different law firms to make the same approaches, saying the same things, on behalf of the same clients as we have now.  We have told our clients' respective US and Japanese lawyers that this is the most appropriate channel for communications going forward and they will be acting accordingly.

Having been involved in similar cases, you will no doubt appreciate that there are numerous urgent safety and operational issues under consideration at present.  That said we have made an effort to respond to your various queries below:

1. It is not the case that ONE has full and unfettered access to the Vessel if that is your question.  ONE is, however, being allowed what we consider to be a reasonable degree of access to the deck cargo spaces.  We do not envisage taking any steps at this point in order seek any greater access.

2. Whilst a degree of co-operation and assistance is envisaged under 8.2, this is primarily concerned with assisting your clients in obtaining evidence in order to allow the defence / settlement of claims brought against them.  That is some time away.

   There is nothing in 8.2 or elsewhere in the CSC which requires our clients to provide or attempt to procure immediate access to the Vessel, nor indeed any access per se.  Further, and to be frank, this is not within our power given that our clients are simply time charterers of the Vessel.

   Needless to say, though, our respective clients have a common interest in this regard which we are fully alive to.

3. As to the provisions at 8.1 (which we believe you intend to refer) we repeat that there is nothing to suggest that immediate access is required, and nor can it be where our clients are not Owners.  Again, the documents to be sought are to be provided in order to assist your clients with *"the defence of the [underlying cargo] case"*.

   Can we suggest that you update the list of documents which you seek and provide the same to us in a complete form?  We will then pass it on to Owners as necessary and request confirmation that all documents are being preserved for future disclosure.  Provided that that assurance is given then we do not see where an application (presumably a Vasso type demand) will get you but that is for your clients of course.

4. We trust that you and your clients will appreciate that there are a very large number of cargo interest and slot charterers surveyors who would like to obtain unrestricted and extensive access to the Vessel. However allowing such access to all parties is just not feasible as you will appreciate.

   Furthermore one of the surveys last week (where your clients' surveyor was in attendance) led to the Terminal itself restricting access, primarily for safety reasons.  These are matters outside of ONE's, and Owners', control.  You will also appreciate that the open access you are demanding, if applied to all surveyors, would inevitably hinder operations (which all stakeholders have an interest in progressing as expeditiously as possible).  It would also, almost certainly, prejudice your clients if Cargo Interests' surveyors joined any local application as a "necessary and proper" party allowing them exactly the same levels of access as your clients demand.  Overall, therefore, we cannot see how bringing any action can actually help your clients in the long run and it may even prejudice defences (an issue on which our clients' rights must remain reserved).

Please also bear in mind that our client's local surveyors are present and have sufficient access to be able to create photographic records of what they are witnessing. These photographs will be disclosed in due course and should, along with provision of the documents which you can reasonably require (whether in the US or other jurisdictions), both answer your client's requests to assist with defending the underlying claims.

As we say, your clients may seek evidence for the purpose of defending claims from cargo interests. However this is some way off. As such, and given what steps our clients are taking to preserve evidence, we do not accept that there is any urgent need (or any need at all) for your clients to contemplate any formal steps. Our clients will co-operate as necessary and properly perform their obligations under the CSC.

In this regard we also anticipate that your clients will be able to rely upon any defences under US COGSA and/or Hague or Hague-Visby Rules, as will apply and as are available. The same will apply under the CSC where similar defences will, if relevant, apply under the Hague-Visby Rules as applicable at 10.1. To this extent our clients have a common interest in responding to Cargo Interests' underlying claims and assisting your clients generally to defend the same upon best possible terms. A focus upon discharging, disposal and/or forwarding of boxes, which our clients are in the midst of trying to resolve, are the immediate priorities however.

To summarise, evidence is being and will be very carefully preserved and will in due course be shared with your clients. However, mitigation and crisis management are the immediate priorities and not the immediate provision of papers and access where there is no need for the same nor indeed right to demand the same at present.

Our client's rights are likewise preserved albeit we trust that the above offers the re-assurance which your clients will wish to see.

Best wishes

Matt


**Matthew Montgomery**
Partner
MFB Solicitors



Direct:   +44 20 7330 8022
Mobile: 073 8452 5255
Web:     www.m-f-b.co.uk

Please click here for our privacy policy, which explains the types of personal data we collect, how we collect and process that information, who we may share it with, and the rights you have in this regard.
This e-mail (including attachments) is intended for the named addressee. It is confidential and may be privileged.
If you have received it in error, please contact us immediately and then delete it. You should not disclose its contents to any other person.
MFB is authorised and regulated by the Solicitors Regulation Authority, whose professional rules and code may be found at www.sra.org.uk/handbook/
A list of partners of MFB is available here, and may be inspected at our office address.
Our services are provided on and subject to our standard terms and conditions of business. For the latest version, please click here or visit our website.

| | |
|---|---|
| **From:** | Alexander Bramwell |
| **To:** | Nick Wilson; Matthew Montgomery |
| **Cc:** | Ian MacLean |
| **Subject:** | ONE APUS [HD-UKLIVE.1073117.136] |
| **Date:** | Friday, March 5, 2021 3:59:33 AM |

Dear Nick,

There are two urgent issues which must be addressed. We deal with each in turn:

**Material Adverse Effect**

We are unclear as to what your client is seeking to "point out" in your email of 19th February 2021.

Your client has referred to sections of THEA and then made a bear statement that: (a) ONE has suffered a "material adverse effect"; and therefore that clause 6.4 becomes effective. In our client's view, this is both commercially and contractually incorrect.

Firstly, for 6.4 to apply, ONE must become an "Affected Line" for the purposes of THEA. In order to be an "Affected Line", ONE must face an occurrence of an Insolvency Event and/or a Material Adverse Change.

A Material Adverse Change is defined in THEA as:

"the occurrence in relation to a Line of any event or circumstance which, in the reasonable opinion of all the other Lines, has or is reasonably likely to have a material adverse effect on the business, operations and/or financial condition of the affected Line. In forming such opinion the other Lines shall, without limitation, be entitled to take into account the affected Line's interim and/or annual financial reports."

Firstly, whether the event was, in fact, a Material Adverse Change is "in the reasonable opinion of all the other Lines". It is not a unilateral decision for ONE to make.

Secondly, a material adverse effect is not simply a temporary loss suffered by ONE. The case of *Grupo Hotelero Urvasco v Carey Value Added* [2013] EWHC 1039 (Comm) is the leading English authority. The court held in that case that in relation to the material adverse change clause:

1. An effect or change is only material if it significantly affects the company's ability to perform its obligations under the relevant agreement.

    Bearing in mind the scope of commitments set out in THEA, is this really what ONE are alleging?

2. An effect or change is not material if it is merely temporary.

    Do ONE allege that this incident will have a permanent effect on ONE's ability to perform its obligations under THEA?

3. Where the clause relates to a company's financial condition, as in this case (see the definition quoted above), this is to be determined primarily by reference to its financial information, which may include interim financial information and/or management accounts.

    If ONE wishes to maintain its position in relation to the application of clause 6.4, please provide full supporting evidence for ONE's current financial difficulties and its potential inability to perform its continuing contractual obligations under THEA.

4. The inquiry is not necessarily limited to ONE's financial information if there is compelling evidence to show that a material adverse change has occurred.

    If ONE have other compelling evidence that the event did, in fact, have a material adverse effect

on ONE's business and ability to perform its obligations under THEA, please provide it.

Notwithstanding the above, and in any event, Clause 2.4 requires the unanimous agreement of the other Lines before any action can be taken:

*"the other Lines may by unanimous agreement and with immediate effect give written notice to the Affected Line to terminate this Agreement, together with any agreement entered into pursuant to Clause 14.4 (a "Cross Slot Charterparty")"*

Again, ONE cannot simply make a unilateral decision not to perform its obligations. Indeed, the intention of the material adverse effect/change provisions in THEA is to give the other Lines the right to remove an Affected Line from the agreement, if that Line can no longer perform its obligations because of its business, operational and/or financial difficulties. Only then does clause 6.4 come into effect. It does not provide special dispensation for the Affected Line, simply not to perform, as you seem to suggest. It would be surprising if your client is inviting the other Lines to consider terminating the Agreement as that appears to be the natural consequence, pursuant to Clause 2.4, of inviting our client (and presumably the other Lines) to accept that there has been a material adverse change

If your client is not seeking to invoke Clause 2.4 it would be appreciated if it could reconsider its position in relation to its assertion that there has been a material adverse change in respect of its business and therefore that it is an Affected Line for the purposes of THEA. Given the not inconsiderable consequences of Clause 2.4, you will appreciate the importance to our client of understanding whether your client is representing that a material adverse change has occurred or not.

**Discharge of Damaged Lashing Gear**

We understand that damaged lashing materials are being discharged from the vessel. Our client's surveyors have attempted to obtain access to these materials in order to make an assessment, however all requests to attend the discharge have so far been denied.

We must therefore reserve our client's rights in relation to this and remind ONE of its obligations to preserve all evidence regarding the incident.

We also demand that our client's surveyor is given proper access now and without further delay.

It is vitally important that evidence is preserved and our client's surveyor is given opportunity to review it. Please confirm what arrangements have been made for the preservation of this equipment and advise when and where our surveyors will be permitted to inspect it. To the extent that you do not have power, possession and control of this equipment, please confirm that your client is utilizing all judicial, statutory and contractual means at its disposal to secure and preserve the equipment for any future proceedings, keeping our client fully advised of the steps that are being taken.

As you are aware, and despite repeated requests, our surveyors and experts were denied access to the vessel prior to the physical alteration and removal of evidence from the impacted bays where containers collapsed or went overboard. This lack of access has deprived HLAG of the ability to conduct any type of meaningful investigation into the cause and origin of this casualty. Accordingly, HLAG reserves all rights, remedies and recourse against ONE for any and all damages and losses arising from, related to, or in connection with ONE's failure to provide access in circumstances where ONE had the power to provide such access, or alternatively, for ONE's failure to facilitate the provision of such access, including utilizing the power of the courts to assist in providing access, in regard to this casualty.

Can you please therefore come back to us on this latter point regarding the lashing gear by return.

All our client's rights are fully reserved.

Best regards,

Alex

Alexander Bramwell
Partner
**HILL DICKINSON LLP**

The Broadgate Tower, 20 Primrose Street, London, EC2A 2EW
TEL: +44 (0)20 7280 9312
MOB:+44 (0)7718 695 770
FAX: +44 (0)20 7283 1144